**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 20, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HASAN ALI HASAN,

Defendant-Appellant.

No. 06-5234

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. CR-05-174-JHP)**

---

Barry L. Derryberry, Research & Writing Specialist, Office of the Federal Public Defender (John V. Butcher, Federal Public Defender, and Shannon M. McMurray, Assistant Federal Public Defender, with him on the briefs), Tulsa, Oklahoma, for Defendant-Appellant.

Stephen L. Sewell, Assistant United States Attorney (David E. O'Meilia, United States Attorney, and Thomas Scott Woodward, Assistant United States Attorney, on the brief), Tulsa, Oklahoma, for the Plaintiff-Appellee.

---

Before **HENRY,** Chief Judge, **HOLLOWAY,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Seeking refuge from the civil war in Somalia, Hasan Ali Hasan fled to the United States and was granted asylum in 1997. Over the years that followed, Mr. Hasan sought to learn English, moved to Oklahoma, worked there as a school bus driver, and married an American. In 2004, a federal immigration agent interviewed Mr. Hasan about statements he made in connection with his 1997 asylum application. In 2005, Mr. Hasan was called to testify before two different grand juries investigating the truthfulness of the information he provided during the 2004 interview. Ultimately, the second grand jury indicted Mr. Hasan, not for lying during the 2004 interview or in his 1997 asylum application, but for perjury during the grand jury proceedings themselves. Mr. Hasan was tried, convicted on three counts of perjury, acquitted on a fourth, and sentenced to fifteen months in prison.

Before us, Mr. Hasan argues, among other things, that Congress, in the Court Interpreters Act ("CIA"), afforded him the right to an interpreter during the grand jury proceedings, that his alleged perjury was really the product of language difficulties he encountered without the assistance Congress guaranteed, and that the appropriate remedy for this statutory violation is the dismissal of the charges brought against him. The district court initially determined that the government's failure to offer an interpreter during grand jury proceedings was not error, and that no interpreter was needed at trial either. Later, however, the district court reversed itself on the latter score, holding that the presence of an

interpreter at trial was required to protect Mr. Hasan's right to a fair trial. The court did not, however, reconsider whether the CIA also required an interpreter at the grand jury proceedings. Because the statute applies with equal force to grand jury proceedings and trials, we think this omission rises to the level of plain error. While it is possible to imagine reasons for the result the district court reached – requiring an interpreter in one setting but not the other – no such reasons are apparent from the record as it stands before us. In deference to Congress's statutory command in the CIA, we therefore remand the matter to the district court so that it might ascertain whether the factors that motivated it to reconsider its ruling about the necessity of an interpreter at trial also pertain to the grand jury context.

I

A

In 1997, Hasan Ali Hasan entered the United States as a 17 year old seeking refuge from the Somalian civil war.[1] Citing persecution he and his family had suffered during the conflict and fear that persecution would resume if he returned to Somalia, Mr. Hasan applied for and was granted asylum in the United States later that same year. It is undisputed that Mr. Hasan is a native Somali

[1] Somalia's central government collapsed in 1991, and subsequent fighting among rival factions resulted in the killing, dislocation and starvation of thousands of Somalis; racial minority groups were "subjected to harassment, intimidation, and abuse by armed gunmen of all affiliations." U.S. Department of State, Somalia Country Report on Human Rights Practices for 1997.

speaker and, at the time he entered this country, communicated with government officials exclusively through an interpreter.

In order to obtain asylum, Mr. Hasan on several different occasions had to describe the persecution that he and his family suffered. In a June 5, 1997 interview, and with the aid of an interpreter, Mr. Hasan stated that four of his brothers and his father were killed in a tribal war two years earlier, and that another brother had been killed five years earlier. In his written application for asylum, submitted on July 8, 1997, and prepared with the assistance of an immigration attorney, Mr. Hasan represented that three of his older brothers were killed by another clan in 1995, and that his father was shot in the knee in 1996. Despite these inconsistencies about the violence directed at his family, Mr. Hasan's asylum application was granted. In the years that followed, Mr. Hasan met his wife, an American who does not speak Somali, and moved to Oklahoma where Mr. Hasan obtained a commercial driver's license and employment as a school bus driver.

In 2004, David Kinnear, a special agent with the Department of Homeland Security's Office of Immigration and Customs Enforcement, reviewed Mr. Hasan's file at the request of the Federal Bureau of Investigation. Although the reasons motivating this review are not clear in the record before us, on conducting the review Agent Kinnear noticed various inconsistencies in Mr. Hasan's 1997 statements and sought and received an interview with Mr. Hasan. The next year,

in April 2005 and then again in November 2005, Mr. Hasan was subpoenaed to testify before a federal grand jury. The grand jury was charged to investigate possible false statements, in violation of 18 U.S.C. § 1001, made by Mr. Hasan in his 2004 interview with Agent Kinnear. Mr. Hasan did not retain counsel to assist him in preparing for either appearance.

At several points during the grand jury proceedings, Mr. Hasan's command of the English language appeared to be in question, some examples of which can be found in Appendix A. To pluck but one here, at the conclusion of his April testimony Mr. Hasan was asked whether he understood the questions he had been asked. Mr. Hasan responded that, while he had attended five semesters of ESL (English as a Second Language) classes since entering the United States, he had difficulty understanding some of the questions asked of him:

> Q: Is there – have you been able to understand what I have asked you?
> A: Not sure about it, but I try to understand it.
> . . .
> Q: So you're pretty able to understand what people say to you in English?
> A: Not, like, 100 percent. I can say, like, 40 percent and if I don't understand, I tell them, What's that mean? There's a lot of words that are hard for me, I can't understand it.
> Q: Okay. Was there anything that I failed to explain to you so that you felt like you understood it?
> A: Most of them.

Addendum of Exhibits, Gov't Ex. 6 at 40-41.[2]

[2] The grand jury proceedings we reference were unsealed by order of the district court. *See* Fed. R. Crim. P. 6(e)(3)(E).

To be sure, the government notes that elsewhere in the transcripts one can find instances where Mr. Hasan appeared more definite about his English ability; for example, testifying at the conclusion of his November appearance, Mr. Hasan represented that he thought he understood everything that was asked of him:

> Q: (By Mr. Woodward) Mr. Hasan, I would like to ask you whether you would like to change any of the answers that you've given to the Grand Jury today, whether you would like to add to them or change them in any way while you have an opportunity to do that?
> A: No.
> Q: Do you think you understood everything I asked you today?
> A: Yeah, I think so.

*Id.*, Gov't Ex. 7 at 42.

In December 2005, the government sought and received an indictment against Mr. Hasan for perjury. It did so not under 18 U.S.C. § 1001, based on either Mr. Hasan's representations in connection with his asylum application or his statements to Agent Kinnear, but instead pursued alleged discrepancies in Mr. Hasan's grand jury testimony, proceeding under 18 U.S.C. § 1623. Count I of the indictment cited allegedly conflicting statements regarding which of Mr. Hasan's brothers had been shot and killed in the Somalian civil war. *See* Appendix B (providing challenged testimony). Count II charged Mr. Hasan with making false statements to the jury regarding violence directed against his sister in Somalia. *See id.* Count III related to inconsistent statements that Mr. Hasan made about a beating that he allegedly received in Somalia. *See id.* Finally, Count IV

concerned allegedly inconsistent statements regarding Mr. Hasan's family name. *See id.*

B

During pretrial proceedings, Mr. Hasan filed two motions relevant for our current purposes. First, he moved to suppress evidence taken from him during the grand jury proceedings – his testimony – and submitted that, without it, the government's indictment lacked any evidentiary basis and had to be dismissed. Mr. Hasan contended suppression of his testimony was required because, during the grand jury proceedings, he was only "summarily advised of his Fifth Amendment rights" to remain silent and to due process, and that he could not have knowingly and intelligently waived these rights given his limited understanding of English.

Second, Mr. Hasan filed a separate motion pursuant to the CIA, 28 U.S.C. § 1827, to secure the services of an interpreter during trial. The CIA makes appointment of an interpreter mandatory when the presiding judicial officer determines that a party or a witness (1) speaks only or primarily a language other than English, (2) so that his ability to comprehend and communicate during the proceedings would be inhibited.[3]

---

[3] The CIA provides, in relevant part:

> The presiding judicial officer . . . shall utilize the services of the most available certified interpreter, or when no certified interpreter is

(continued...)

With respect to the first CIA test, Mr. Hasan argued that his primary language was Somali, and pointed out in his brief that the government had not contended otherwise. With respect to the second statutory test, Mr. Hasan proffered the testimony of Dr. Gene Halleck, a linguistics expert, who testified at a pretrial hearing that Mr. Hasan's limited English abilities would prevent him from participating meaningfully in his defense without the aid of an interpreter. Dr. Halleck also testified that Mr. Hasan had never been properly educated in his native language of Somali, making it more difficult for him to learn and understand a second language. For its part, the government presented several federal agents who had interacted with Mr. Hasan and who testified that they were able to understand him with little or no difficulty.

---

[3](...continued)

> reasonably available . . . the services of an otherwise qualified interpreter, in judicial proceedings instituted by the United States, if the presiding judicial officer determines . . . that [a] party . . . or a witness who may present testimony in such judicial proceedings-
>
> (A) speaks only or primarily a language other than the English language; or
>
> (B) suffers from a hearing impairment (whether or not suffering also from a speech impairment)
>
> so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.

28 U.S.C. § 1827(d)(1).

On March 13, 2006, the district court denied both motions. With respect to the motion to suppress evidence and dismiss the indictment, the court noted that at both grand jury proceedings the government had amply advised Mr. Hasan of his Fifth Amendment rights, as well as the consequences of perjury; that Mr. Hasan affirmatively indicated that he understood those rights and potential consequences; and that he never requested an interpreter at any point during those proceedings.

With respect to the motion seeking an interpreter at trial pursuant to the CIA, the court found that Mr. Hasan failed at the first statutory step – namely, that he did not speak only or primarily a language other than English. In reaching its decision, the district court relied on, among other things, the fact that Mr. Hasan had been in the United States for nine years; had been employed both as a security guard and as a school bus driver, occupations that required him to communicate in English; and had taken five English proficiency courses, as well as two commercial driving tests (passing both), in English. R., Vol. I, Doc. 56 at 4-5 ("D. Ct. Order"). The court further reasoned that Mr. Hasan speaks English on a daily basis, because his wife does not speak Somali, and held that there was no evidence developed before it that Mr. Hasan was any more proficient in his native language of Somali than he was in English. *Id*. at 5.

C

Three days after the court issued its rulings, on March 16, 2006, Mr. Hasan filed a motion to reconsider. This motion was limited to revisiting the question whether an interpreter during trial should be appointed under the CIA and did not seek to revisit his Fifth Amendment-based motion to dismiss. Mr. Hasan pointed again to Dr. Halleck's testimony, proffering that she could testify further about the "unlikelihood" that a post-pubescent individual such as Mr. Hasan would ever be able to master a secondary language to a greater degree than his native language, and also offered the testimony of Mr. Hasan's wife that he continued to communicate daily in Somali, both over the phone and in written form. On March 17, the district court denied the motion to reconsider.

During this period, the government filed two motions seeking to exclude Dr. Halleck's testimony on *Daubert* grounds. The first motion, filed during the pendency of Mr. Hasan's CIA motion, sought to have her testimony at the pretrial hearing on the need for an interpreter disregarded and also to have her precluded from testifying at trial about Mr. Hasan's language abilities. R., Vol. I, Doc. 48. The second motion, captioned a "Supplemental Motion," renewed the objection to Dr. Halleck's testimony at trial. R., Vol. I, Doc. 76. While the district court declined to rule that Dr. Halleck's pretrial testimony should be disregarded with respect to the need for an interpreter, D. Ct. Order at 3, on April 12, it granted the government's *Daubert* motion with respect to trial.

In this same order, however, the district court proceeded, *sua sponte*, to reconsider the question whether an interpreter should be present at trial, this time holding one was necessary. R., Vol. I, Doc. 85. In reaching this conclusion, moreover, the court expressly relied on Dr. Halleck's expert report, explaining that,

> [a]fter reviewing the report of Halleck, however, this Court has reconsidered its previous order denying the Defendant's Motion for an Interpreter. While it is clearly a question of fact for the jury whether or not the defendant understood the questions asked during the grand jury proceedings, it is this Court's duty to ensure the Defendant's rights to due process during these proceedings are not infringed.

*Id*. at 8.[4] The district court then proceeded to express concern about Mr. Hasan's ability to communicate effectively with counsel, noting that "[d]efense counsel, as an officer of the court, has indicated that he is having difficulty communicating with his client," *id.*; the district court also expressed concern about Mr. Hasan's ability to keep up with conversations in the courtroom, explaining that "since witnesses have a tendency to speak rapidly when under the stress of the witness stand and attorneys generally speed up their questions as the witnesses' answers become quicker, this Court finds the best way to ensure that the defendant's constitutional rights are protected is to appoint an interpreter," *id.*

[4] Though it successfully excluded her from trial, the government does not challenge before us the district court's reliance on Dr. Halleck's expert report in connection with its pretrial decisions regarding whether to appoint an interpreter.

At the trial that followed, Mr. Hasan was convicted of the first three counts of the indictment but acquitted on the fourth, and later sentenced to fifteen months imprisonment and three years of supervised release on each count, to run concurrently.

II

On appeal, Mr. Hasan seeks dismissal of the indictment against him. He contends that the prosecutor conducting the grand jury proceedings had an obligation under the CIA to provide him with an interpreter during those proceedings. Because the prosecutor failed to do so, Mr. Hasan submits, the appropriate remedy is the suppression of the grand jury transcripts and, without the benefit of the grand jury proceedings, his indictment lacks an evidentiary basis and should be dismissed.[5]

---

[5] While we have held that a district court's factual findings in connection with motions for an interpreter pursuant to the CIA must be made on the record, *United States v. Osuna*, 189 F.3d 1289, 1292, 1294 (10th Cir. 1999), we do not understand Mr. Hasan to be arguing that the prosecutor during grand jury proceedings has an obligation to make similar factual findings on the record. Neither would we endorse such an argument; requiring factual findings by a prosecutor at a grand jury proceeding would be exceedingly odd. Grand jury proceedings are not adversarial proceedings where parties may present competing evidence and, unlike a district court judge, the presiding judicial officer at the grand jury, the prosecutor, is hardly well suited to issue neutral factual findings. That said, nothing precludes the prosecutor conducting grand jury proceedings from asking questions designed to make a record with respect to the CIA's two statutory tests; in fact, doing so may well be the prudent course in order to minimize the number of challenges like this one in cases where language difficulties are apparent. But, ultimately, in cases like this one – challenging an indictment in district court on the basis that the prosecutor failed to supply an

(continued...)

Before reaching the merits of this argument, we must address an antecedent question implicating our standard of review. We traditionally review a district court's denial of a motion to dismiss an indictment for abuse of discretion. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1265 (10th Cir. 2006). But when a party fails to preserve an issue before the district court, our review is more circumscribed, limited to ascertaining whether the error charged on appeal qualifies as plain error. *United States v. Taylor*, 514 F.3d 1092, 1096 (10th Cir. 2008). Rather unusually, the parties before us both seek to concede the standard of review to the other side.

For his part, Mr. Hasan readily admits that, although he seeks the same remedy as he did in pretrial proceedings before the district court (dismissal of the indictment), the vehicle he seeks to employ to get there is now very different and, from this, concludes that our review should be only for plain error. Before the district court, Mr. Hasan's motion to dismiss rested exclusively on the contention that he was not fairly advised of and failed to understand his *Fifth Amendment* rights during the grand jury proceedings. The district court found that, whatever other difficulties Mr. Hasan may have had during those proceedings, he was well advised of his rights under the Fifth Amendment and did seem to understand

---

[5](...continued)
interpreter during grand jury proceedings in conformance with the CIA – we will continue to rely on the district court to conduct an independent inquiry into whether the grand jury proceedings conformed to the statute and to make factual findings in aid of its decision.

them; Mr. Hasan does not contest the district court's holding on that score. Instead, on appeal Mr. Hasan argues that the government had an obligation *under the CIA* to supply him with an interpreter during the grand jury proceedings. While Mr. Hasan raised the CIA in pretrial proceedings, he did so only in the context of suggesting that the district court *itself* had a statutory obligation to appoint an interpreter *during trial*; at no point did Mr. Hasan argue, as he now does, that (i) the CIA pertained to grand jury proceedings, (ii) the prosecutor conducting the grand jury had an affirmative obligation under that statute to consider the need for an interpreter, or (iii) his failure to do so formed a basis for suppressing evidence taken in those proceedings and dismissing the indictment.

For its part, the government submits that abuse of discretion review controls. In aid of its position, one might well note that the district court initially ruled on both of Mr. Hasan's pretrial motions for an interpreter in a single order, perhaps suggesting, as the government represents with its concession, that the parties and district court were on notice of the need to consider not just the Fifth Amendment but also the CIA's applicability to the grand jury proceedings.

We appreciate the parties' candor and the professionalism it represents. Happily, however, we need not decide whose concession is correct because we conclude that Mr. Hasan prevails under even the more exacting standard he proposes. To warrant relief under our plain error standard of review, an appellant must show not just (a) the existence of an error, but also that the error is (b) plain,

and (c) affects the substantial rights of the appellant, as well as (d) the fairness, integrity, or public reputation of judicial proceedings. *Taylor*, 514 F.3d at 1100. In what follows, we explain why we believe Mr. Hasan has managed to clear each of these hurdles.

## III

### A

The error we see here is an apparently inconsistent application of the CIA. In its March 13, 2006 ruling, the district court found that Mr. Hasan's primary language was English, the first and a dispositive inquiry under the CIA, making the appointment of an interpreter before the grand jury or at trial unnecessary. Yet, in its April 12, 2006 ruling, the district court reconsidered its previous denial of Mr. Hasan's motion for an interpreter at trial – a motion expressly pressed under the CIA – and held that an interpreter was required. In doing so, the district court emphasized Mr. Hasan's difficulties comprehending the proceedings and fairness concerns, essentially tracking the second step of the CIA. And because the court found that the second step was met and proceeded to appoint an interpreter, it appears that the district court implicitly changed its view on the first step (namely, deciding that Mr. Hasan's primary language was other than English). Yet, having found that the CIA required an interpreter at trial, the court did not pause to (re)consider whether an interpreter had also been necessary before the grand jury.

The difficulty with this series of events is the fact that the CIA admits no distinction between the grand jury and trial contexts. In 1988, Congress amended the CIA, originally enacted in 1978, specifically to extend the statute's guarantees from the trial context to grand jury proceedings. *See* Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, §§ 708, 710, 102 Stat. 4642 (1988). It did so by requiring the "presiding judicial officer" at *any* "judicial proceedings instituted by the United States" to provide an interpreter when the statute's test is met, 28 U.S.C. § 1827(d)(1), replacing statutory language that previously required the appointment of an interpreter only at "criminal or civil action[s] initiated by the United States in a United States district court," Court Interpreters Act, Pub. L. No. 95-539 § 2(a), 92 Stat. 2040 (1978). Lest any confusion remain, Congress then proceeded to define the term "judicial proceedings instituted by the United States" to embrace "grand jury proceedings." 28 U.S.C. § 1827(j).[6]

Given the clarity and strength of Congress's instruction that the CIA provides a uniform test and guarantee, applicable to grand jury and trial

---

[6] The parties before us agree that the CIA makes the "presiding judicial officer" at grand jury proceedings the United States Attorney, 28 U.S.C. § 1827(i), and that the presiding judicial officer bears the affirmative responsibility under the CIA to consider the need for an interpreter when language difficulties become apparent. *See Osuna*, 189 F.3d at 1292, 1294. The government likewise has not contested that, if it failed to comply with the CIA, the appropriate remedy in this case is the suppression of the grand jury transcripts and that, without those transcripts, dismissal of the indictment follows. The government does not argue, for example, that a remedy other than suppression of the transcripts would be more appropriate, or that the indictment could survive without them.

proceedings alike, once the district court *sua sponte* reversed itself and found that an interpreter was required at trial in response to Mr. Hasan's CIA-based motions, we see no way it could avoid revisiting the lack of an interpreter during Mr. Hasan's grand jury testimony. If Mr. Hasan had so much difficulty communicating with his own (friendly) counsel at trial that an interpreter was needed, one cannot help but wonder: was Mr. Hasan's ability to communicate with a (decidedly less friendly) prosecutor during grand jury proceedings similarly impaired? Neither can this apparent contradiction be dismissed as inconsequential. While the lack of an interpreter at a felony trial is no small thing, the defendant still enjoys at least the assistance of counsel. Before the grand jury, a target has no such help. And Congress, when amending the CIA in 1988, expressly voiced concern that language confusion in grand jury proceedings can lead to erroneous indictments for perjury, exactly what Mr. Hasan contends occurred here. As the House Report accompanying the amendment to the CIA that extended the right to an interpreter to grand jury proceedings explained:

> Nowhere in the American system of justice is there more potential to destroy a person's reputation than through an ill-founded indictment. There has been one celebrated case where poor language interpretation during grand jury proceedings led to an inaccurate indictment for perjury. Accordingly, this title would extend the use of court interpreters to grand jury proceedings.

H.R. Rep. No. 100-889, at 58 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5982, 6018.

Our case law, too, confirms that leaving unresolved apparently contradictory rulings on issues of similar consequence is legal error. In *United States v. Atencio*, 476 F.3d 1099 (10th Cir. 2007), the district court adopted findings in a presentence report ("PSR") that the defendant had "regularly" abused his girlfriend, as well as the inconsistent findings in an Addendum to the PSR, which indicated that the defendant had not engaged in a pattern of beating his girlfriend. *Id*. at 1106. Based on these contradictory findings, the district court found the defendant had a history of abusing women and varied its sentence upwards on that basis. *Id*. We held that "the district court plainly erred [by] failing to resolve the conflict," reasoning that "[t]his error deprived [the defendant] of his substantial due process right to a ruling on the disputed issue, which may have undermined a significant basis for the variance and resulted in a lower sentence." *Id*. at 1107; *see also United States v. Wolfe*, 435 F.3d 1289, 1300 (10th Cir. 2006) (remanding for the district court to reconcile unobjected-to conflicting factual statements contained in a PSR). Much the same might be said here: to leave the conflicting findings about Mr. Hasan's language abilities unresolved poses the risk that he was deprived of a right guaranteed by Congress for the declared purpose of minimizing the grave consequence of a mistaken indictment.

Of course, we may venture to affirm a district court "for any reason supported by the record," *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206

(10th Cir. 2007), and the government urges us to do just that on the basis that Mr. Hasan well understood what was asked of him during the grand jury proceedings and asked for clarification when he did not: "[I]t was obviously apparent to [the prosecutor] that Hasan did not need an interpreter because he continued the questioning without an interpreter and Hasan asked questions when he did not understand the meaning of a word," Gov't Br. at 31.

On the record now before us, however, we can hardly say that Mr. Hasan's comprehension is "obviously apparent." The record contains a welter of conflicting evidence on both statutory steps. On the one hand, in support of its March ruling, the district court rightly explained that Mr. Hasan had been in the United States for nine years; had been employed both as a security guard and as a school bus driver, occupations that would require him to communicate in English; had successfully completed five English proficiency courses, as well as two commercial driving tests in English; and had married an American who does not speak Somali. On the other hand, in support of its April ruling, the district court expressed concerns that defense counsel was unable to effectively communicate with his client and that Mr. Hasan would be unable to follow exchanges between witnesses and attorneys during trial. And the record does reflect that Mr. Hasan is a native speaker of Somali; the district court received Dr. Halleck's pretrial testimony that a native speaker of a language other than English with Mr. Hasan's educational background would have difficulty mastering a secondary language;

and Mr. Hasan's grand jury testimony does evidence some degree of confusion and trouble with the English language. *See* Appendix A.

In light of the evidentiary support for both the district court's initial ruling that no interpreter was required and in particular for its subsequent ruling that one was required due to concerns about Mr. Hasan's ability to communicate in English, we are in no position to suggest the record definitively tilts in the government's favor. To be sure, the fact that the record exhibits some unresolved contradictions may well be attributable to Mr. Hasan's failure to argue clearly for the CIA's application to the grand jury context – a failure he, if not the government, readily concedes. And, on remand, the district court may issue factual findings that resolve such tensions and results in a ruling for (or against) the government. The district court may also be able to supply some plausible reason to distinguish between Mr. Hasan's trial and grand jury appearances or to reconcile its prior rulings.[7] We offer no opinion on what the ultimate disposition of this case will be. But we do hold that only the district court can, in the first

[7] For example, while Mr. Hasan pressed his initial motion for an interpreter at trial, as well as his motion for reconsideration, under the CIA, it is at least possible the district court, although it never said so, thought that (i) the CIA did not require an interpreter because Mr. Hasan's primary language was English, as it had earlier concluded, but (ii) it would nevertheless exercise its inherent authority to appoint one. *See* Fed. R. Crim. P. 28 (providing that a court "may" appoint an interpreter). But this is all a matter of speculation, and we pass no judgment on its plausibility or whether it might survive review.

instance, make the factual findings on the CIA's two statutory steps that are essential to resolving the discrepancies currently apparent in this record.

B

The error we discern in this record qualifies as "plain." *Taylor*, 514 F.3d at 1100. To affirm, we would have to let stand an apparently inconsistent application of a statute that Congress has unequivocally instructed us to apply consistently to trials and grand juries. *See* 28 U.S.C. 1827(d)(1), (j); *supra* Section III.A. We would, in effect, have to ignore the fact that, although the district court found Mr. Hasan was apparently entitled to an interpreter at "judicial proceedings instituted by the United States," he received an interpreter at only one such proceeding. We would also have to ignore our own precedent in the CIA context finding plain error in arguably even less problematic circumstances. In *United States v. Osuna*, 189 F.3d 1289 (10th Cir. 1999), a defendant whose native language was other than English testified on his own behalf at trial. On appeal, the transcripts of his testimony suggested language difficulties had inhibited the defendant's ability to communicate with his lawyer on direct examination and thus to make his testimony understood by the court and the jury. *Id*. at 1292. We held the district court's failure to apply the CIA under such circumstances to be plain error even though defense counsel affirmatively stated that he did not wish to have an interpreter, and despite the fact that the CIA was apparently never called to the district court's attention. *Id*. at 1294 n.4.

Here, by contrast, not only was the court's attention drawn to the CIA, at least in the context of trial, the district court affirmatively found an interpreter *was* necessary in that context to protect Mr. Hasan's rights. And far from disclaiming a desire to have an interpreter present, Mr. Hasan's counsel repeatedly pressed the need for an interpreter.

C

Our third inquiry on plain error review concerns whether the error affects the defendant's "substantial rights." On this score, our precedent instructs that, somewhat contrary to what the phrase might seem to suggest, we ask only whether there is "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Andrews*, 447 F.3d 806, 811 (10th Cir. 2006) (internal quotation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002). We therefore must ask whether we are in doubt that, had the district court reconsidered both motions for an interpreter rather than only the one, it would still have denied the motion to dismiss the indictment. Given the conflicting record evidence on Mr. Hasan's language ability and the district court's apparently conflicting factual findings, we do indeed have such doubts.

Of course, our standard is couched in terms of probability, and we cannot say with certainty what the district court will find on remand. *See supra* Section

III.A. But the factual findings that would mandate an interpreter at trial under the CIA are very similar to, if perhaps not completely coextensive with, the findings that would mandate an interpreter at the grand jury. It is this nexus – between the express and seemingly implicit findings supporting the district court's second order and the factual findings that would mandate the appointment of an interpreter at the grand jury proceedings – that causes us to doubt the outcome of a reconsideration of the denial of the motion to dismiss. For example, it seems "reasonably probable" that if Mr. Hasan's primary language was other than English on April 12, 2006, the date the court appointed an interpreter, his primary language was also other than English in April and November of 2005, the dates of the grand jury proceedings. And if Mr. Hasan's language difficulties inhibited his communication with his own attorney at trial, then it again seems "reasonably probable" that his communication with a prosecutor in the grand jury proceedings would also be inhibited. Neither does the government contest that, if the CIA did require appointment of an interpreter during the grand jury proceedings, suppression of Mr. Hasan's testimony and dismissal of the indictment is the appropriate remedy. *See supra* note 6. Under these circumstances, and in the current absence of a ruling from the district court reconciling the two sets of seemingly inconsistent factual findings, we believe Mr. Hasan has indeed shown a reasonable probability that his motion to suppress and dismiss would have been granted had the district court reconsidered both motions for an interpreter.

D

Under the final prong of our plain error test, we may provide relief only if the district court's error "seriously affects the fairness, integrity, or public reputation of judicial proceedings," *Taylor*, 514 F.3d at 1100, but we believe this test is easily met here. When Congress amended the CIA to apply to grand jury proceedings, it did so specifically to reduce the chances of false perjury indictments spawned by simple language difficulties, *see supra* Section III.A, and there surely can be few matters that so directly affect the "fairness, integrity, or public reputation of judicial proceedings" as the reliability of our criminal indictments. Neither can there be any question that this case implicates these very concerns. The statute under which Mr. Hasan was indicted required proof that he *knowingly* offered false grand jury testimony. If the inconsistencies in his testimony were instead the product of honest communication problems caused by the lack of a statutorily-mandated interpreter – a possibility the district court's reconsidered order appointing an interpreter at trial makes "reasonably probable" – then we may be faced with the intolerable injustice of a man wrongly accused.

IV

On remand, the district court's inquiry ought to follow at least these two steps, although of course either may be dispositive if not resolved in Mr. Hasan's favor. First, it should consider whether, at the time of the grand jury hearings, Mr. Hasan spoke "only or primarily a language other than the English language."

28 U.S.C. § 1827(d)(1)(A). As the district court correctly perceived, this inquiry is not resolved simply by asking whether Mr. Hasan's native language is other than English. Neither do we think the statute concerns itself with primacy in the sense of which language the defendant speaks most frequently; instead, it seems to us that the term "primarily" in this statute seeks to measure the defendant's comparative ability to speak English.

The Oxford English Dictionary defines the word "primarily" as "[i]n the first order in time or temporal sequence," or as "[w]ith reference to other than temporal order: In the first place, first of all, preeminently, chiefly, principally; essentially." XII Oxford English Dictionary 472 (2d ed. 1989). While the former definition could suggest "native language," or the language first learned, we believe the structure of the statute makes clear that Congress intended the latter definition of the term focused on comparative ability. The CIA extends the right to an interpreter to two classes of people: those who speak only or primarily a language other than English, and the hearing impaired. 28 U.S.C. § 1827(d)(1)(B). The fact that the right is extended to the hearing impaired suggests that Congress was not concerned about the frequency with which one speaks English, or whether one is a native speaker; a hearing impaired person in the United States might well be a native English speaker and speak English on a daily basis, but might not be able easily to understand or communicate in English. Thus, it seems to us the question the statute poses concerns the ability to

communicate. Confirming this conclusion, reading the word "primarily" to mean "native" would violate a cardinal rule of statutory construction by rendering surplusage the word "only" in the statutory phrase "only or primarily a language other than English." *See, e.g.*, *Hill v. Kemp*, 478 F.3d 1236, 1247 (10th Cir. 2007). Whether a witness's native language was the only language he spoke would be irrelevant, because a witness able to speak only a language other than English would always have as his native language a language other than English.

Second, if the district court finds that at the time of the grand jury proceedings Mr. Hasan's primary language was other than English, it must determine whether the lack of an interpreter during his testimony inhibited his "comprehension of the proceedings or communication with . . . the presiding judicial officer, [or his] comprehension of questions and the presentation of . . . testimony," 28 U.S.C. § 1827(d)(1), "to such an extent as to have made the [hearing] fundamentally unfair," *Osuna*, 189 F.3d at 1293. This is itself a two-step inquiry. First, the district court must assess whether comprehension or communication was inhibited during his grand jury testimony, or in other words, whether the second prong of the statute is met. If it is met, then it was error for the prosecutor to fail to appoint an interpreter.

If the district court does find error by the government, the court must then ask whether the error rendered the grand jury proceedings "fundamentally unfair." *Id*. To be sure, the term "fundamental fairness" (or unfairness) is far from self-

defining, but neither are we entirely devoid of guidance about its scope and import. In the CIA context, courts coming before us have explained that an inquiry into fundamental fairness focuses on "whether the purposes of the Act [comprehension of the proceedings and the ability to effectively communicate] were adequately met." *United States v. Valladares*, 871 F.2d 1564, 1566 (11th Cir. 1989) (Powell, J., sitting by designation); *United States v. Sanchez*, 928 F.2d 1450, 1455 (6th Cir. 1991), *overruled on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002); *United States v. Edouard*, 485 F.3d 1324, 1341 (11th Cir. 2007). Minor deviations from ideal communication therefore have been held not to render a proceeding fundamentally unfair. *United States v. Huang*, 960 F.2d 1128, 1135-36 (2d Cir. 1992); *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990). And the Supreme Court has instructed, in applying a similar standard to ineffective assistance of counsel claims, that the standard means courts should ask whether, having found error, the result of the proceeding was nonetheless "reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Kimmelman v. Morrison*, 477 U.S. 365, 393 (1986) (Powell, J., concurring). Thus, the court must determine whether, despite any error, the proceeding nevertheless was able to "reliably serve its function," *Rose v. Clark*, 478 U.S. 570, 577-78 (1986), which in the case of a grand jury proceeding is both to ascertain the existence of "probable cause to believe a crime has been

committed" as well as to protect "citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343 (1974).[8]

* * *

Congress has provided witnesses who meet certain requirements with a statutory right to an interpreter at all "proceedings instituted by the United States." In deference to this legislative command and our precedents, the district court must consider whether its findings and conclusions leading to its appointment of an interpreter at trial apply to Mr. Hasan's grand jury appearances, and we remand this matter for such a determination as well as any other proceedings the district court deems appropriate that are not inconsistent with this opinion.

*So ordered.*

---

[8] Having determined that a remand on the CIA question is required, we decline to reach Mr. Hasan's separate challenge to the sufficiency of the evidence to support his convictions. If the district court finds that the CIA required that an interpreter be available to Mr. Hasan during his grand jury testimony, then the transcripts will be suppressed and the indictment dismissed, rendering consideration of the convictions themselves unnecessary. Meanwhile, if the district court determines that, the factual basis for appointing an interpreter at trial notwithstanding, Mr. Hasan's testimony before the grand jury was not rendered "fundamentally unfair" by the lack of an interpreter, Mr. Hasan may raise his sufficiency challenges again on appeal, as well as any claims that may arise from the district court proceedings on remand.

## Appendix A[*]

On April 5, 2005, the following exchanges occurred:

Q: Now, as you – I think I had asked you a question about whether you had been harmed before you came to the country. You mentioned your brother being dead and you mentioned your father – today you mentioned that your father was shot. Any harm come to you?

A: What's the meaning harm?

Q: Hurt. Were you injured, were –

A: No.

Q: Nothing; right?

A: Nothing.

Q: Okay. Do you recall having given the answer to, Do you have any fear or concern about being returned to your home country or being removed from the United States, and your answer was, I was beaten up four months ago?

A: Yeah, beaten up, but I – they didn't shot me or break me – my– my body. I mean, I didn't get hurt, but they beat me up.

Q: So now your answer is that you were beaten, but you weren't harmed?

---

[*] The portions of Mr. Hasan's testimony quoted in Appendices A and B are reproduced exactly from the transcription of Mr. Hasan's grand jury testimony contained in the record.

A: Yeah, I think so. Yeah.

Q: And that beating, that didn’t cause you any harm; right? Cause you concern; correct?

A: What’s concern mean?

Q: Fear. Caused you to be so fearful that you couldn’t return to Somalia; correct?

A: Yeah. And I was running, too, because I know they were trying to kill everybody.

Addendum of Exhibits, Gov’t Ex. 6 at 15-16.

Q: Do you recall having given the answer, One day, four of my brothers and father were killed?

A: No, my father didn’t say he got killed.

Q: So if the interview transcript reflects that that’s what you said, they just got it wrong?

A: No, I didn’t say my father got killed. I said my father got shot on the left leg.

*Id*. at 18.

Q: Your answer then was, Well, this was another smaller brother who was killed on account of tribal hatred. Do you remember having given that answer?

A: What’s that mean?

Q: You gave the answer, so you tell us what is means. I'll read it again, This was another smaller brother who was killed on account of tribal hatred. So you're telling the investigator who's asking you about the discrepancy between the statement you made at the airport when you first got caught and the statement at this time in '97 when you're being interviewed where you alegedly said your brothers were killed two years ago. You've told us today only one brother was killed and yet you answered, This was another smaller brother who was killed on account tribal hatred?

A: That was before the war, he got killed on a car – you mean, hit by a car.

Q: Do you recall having been asked the question: Were you ever tortured in Somalia? Do you remember that question?

A: No.

Q: Were you ever tortured in Somalia?

A: What does it mean, tortured?

Q: Did anyone in Somalia do thing to you that hurt you physically?

A: Yeah.

Q: What did they do to you?

A: Killing my brother, shot my father, try raping my sister.

Q: I'm talking about you.

A: About me?

Q: Yeah. What happened to you?

A: Beaten up and chasing me, trying to kill me.

Q: What injuries did you receive as a result of having been beaten as you now claim?

A: What's that mean?

Q: How were you hurt by being beaten?

A: Just break my teeth and I was trying to run away from them.

*Id*. at 20-21.

Q: When you had the allergy problem with your eyes, was it terribly painful?

A: Sometimes. Sometimes I used to wake up going to school closing my eyes with a pen and couldn't see until it gets dry, afternoon, 1:00.

Q: My question was: Did it hurt? Was it so painful to you to have allergies that you – you wanted to use that as some basis for staying in the country?

A: Because of that, use to stay in the country?

Q: Yes.

A: No, because I don't have anywhere else to go. If I go back to my country, they kill me.

Q: No, my – my question is: Was the problem of your allergies so painful, did it hurt so much that you wanted to use that as a reason to stay I this country?

A: I couldn't understand it.

Q: Did you use your eye problem in order to stay in this country?

A: Still I didn't get it.

*Id*. at 22.

Q: Did you get a defective or improper equipment in December of '02?

A: What's – what's that again?

Q: Broken equipment, like a taillight or headlight or something like that?

A: No.

Q: No?

A: No. No.

Q: Okay. Did you get a defective or improper equipment in the third month of 2003?

A: Improper?

Q: Defective or improper equipment?

A: What's that, improper equipment?

Q: The same thing like you have –

A: I – I remember it, I guess, in 2003 improperly – and, like, you know getting out of the line. Couldn't control the car, but I didn't break a light.

*Id*. at 29.

Q: How would you describe your relationship with Muhidin Mohammed?

A: I can't say. He has last family name and he's good with the family. There was good relationship between them.

Q: Who is Aweis M. Mohammed? And that's A-W-E-I-S M. Mohammed.

A: He's – he's a family member, too. I think they are almost brothers, like, cousins – two cousins.

Q: All right. What is his relationship to you, if any?

A: He's with the – he knows the family more than me.

Q: All right. Are you telling this Grand Jury that he's not part of the family, but that he is a friend of the family?

A: No, he's – the last name's the same. I mean, the last name is the family name, but all I know is all – is he knows more about my dad. He knows a lot.

Q: In our country, there can be a lot of people with the last name of Jones, but it doesn't mean they are related; right?

A: (Nods head.)

Q: They can be friends, but they don't necessarily – they aren't necessarily part of the same family. Do you understand what I'm saying?

A: Yeah.

Q: All right. My question to you is: Aweis M. Mohammed, is he family by blood, right, or is he just a friend of yours and your family?

A: He's – I can say that he's part of the family, but part of the family from far. From – I can – you know, from like – like, you can say whenever you used to see them or the only person we see is him. We didn't see his family.

Q: All right. I need for you to tell me whether he is a friend of the family or whether he is a member of the family. Is he a brother?

A: No.

Q: Is he a cousin, is he an uncle, or is he just a friend of the family?

A: I can say he's like uncle.

Q: He's like an uncle?

A: Yeah.

Q: Is he an uncle, not like an uncle? Is he an uncle or not by blood? Is he related to you by blood?

A: Yeah.

Q: Okay. And you say he is an uncle?

A: I can say an uncle, but he's far from the family. But he – he's part of the family, but from far.

*Id*. at 31-33.

Q: All right. I'd like to give you an opportunity to clarify any answer that you have given today under oath, add to any answer, change any answer in any way if you chose to do so. This is your opportunity if you feel that there is something that you need to make clear, something that you need to change in an answer that you've given, this is your opportunity to do that if you feel a need to do it.

A: Actually, I don't – I don't remember anything and I don't know how to change it – how to say it.

Q: Is there – have you been able to understand what I have asked you?

A: Not sure about it, but I try to understand it.

Q: Okay. Is there anything that you can recall that you didn't understand.

A: I don't remember. I can't remember all the questions at one time.

Q: All right. Are you going to school in this country?

A: I was in a school.

Q: What school?

A: I was in the auto school, nighttime, and then I went to ESL. That's why I got my English better. I went and I finished five semesters.

Q: Five semesters of English?

A: Yeah, I have a certificate to five of them.

Q: Did you do well in the English school?

A: Yeah.

Q: So you're pretty able to understand what people say to you in English?

A: Not, like, 100 percent. I can say, like, 40 percent and if I don't understand, I tell them, What's that mean? There's a lot of words that are hard for me, I can't understand it.

Q: Okay. Was there anything that I failed to explain to you so that you felt like you understood it?

A: Most of them.

Q: You understood most of them?

A: Yeah.

Q: Okay. Is there anything that you – you think maybe you didn't understand?

A: I don't remember. I mean, it's not – I can get it – I can't say it even.

*Id*. at 40-41.

On November 7, 2005, Mr. Hasan testified as follows:

Q: Okay. And when was your brother killed?

A: Somalia, Indonesia.

Q: When?

A: When. When we were there. It was 19 – around 1996.

Addendum of Exhibits, Gov't Ex. 7 at 10.

Q: All right. When you were born?

A: Somalia.

Q: When?

A: 199 – 1980.

*Id*. at 22.

Q: Do you recall having been interviewed in this Grand Jury previously?

A: What – what do you mean?

Q: Do you remember having been here before?

A: Yeah.

Q: So do you recall telling the Grand Jury that the man who – who brought you into the country, do you remember having answered, He's a fat man. I don't know his name really and he's Canadian?

A: Yes.

Q: Do you recall having been asked, So a Canadian fat man that you don't know his name, brought you into this country?

And your answer: Yeah, and actually he took me as his son and who put me on his uncle because he couldn’t hold me there because he had more than – I mean, he couldn’t hold me because he had all of his kids around him and he said, I’m going to go ahead and pay this guy to take you some place safe.

Question: Okay. And it was not true, was it, that you were his son?

Your answer: No, I wasn’t his son.

Question: It was not true that he was your uncle?

And your answer: No, he was my uncle.

A: No.

Q: He was my uncle?

A: The person who paid is my uncle, but it was not that person who bring me –

Q: I think I understand. I think I understand what you’re saying. Your uncle is the one that paid that person?

A: Yeah.

Q: All right.

A: On the person bring me here.

Q: All right. I – I think I see that.

*Id*. at 23-24.

Q: What injuries did you receive when they hurt you in Somalia?

A: There is no injury, just beating me up. There was beating up and I had some blood in my mouth.

*Id*. at 33.

Q: Aweis Mohammed, A-W-E-I-S, is he related to you?

A: Yes.

Q: How?

A: Actually, it's from – he led me from far of the family. It's the same group of family. He's from Fagi, too. And he used to live here, but I don't know. He used to live in Virginia, but I don't know where he lives now. I didn't see him a long time ago.

Q: Is he a cousin?

A: No.

Q: He is related to you by blood?

A: What do you mean, by blood? He's – as I said, like he's far from the family. Like he have the same name of the family.

Q: Yeah.

A: So he's related to me like that. Like – and all from what – I don't know how to say this, like a family name.

Q: Okay.

A: All together.

Q: Let me see if I can get at this. You have a mom and a dad; right?

A: Yes.

Q: They have moms and dads?

A: Yes.

Q: Right. And they had moms and dads?

A: Yeah.

Q: Okay. Is he related to you through blood?

A: Yes.

Q: Okay. And how?

A: How?

Q: Is he a cousin, is he an uncle, is he – you know whose son –

A: You can say –

Q: – is he?

A: You can say kind of cousin, but it's not a cousin. It's far from the family.

Q: Okay. So I asked you is he a cousin and your answer is, I can say he's like uncle?

A: Uncle, cousin, I think is the same thing.

*Id*. at 36-38.

Appendix B

Count I

Count I rested on the following testimony. At the April hearing, Mr. Hasan testified:

Q: What's the name of your brother that had been killed?

A: Sadad.

. . .

Q: And how long before 1997 when you filled out this form had your brother been killed?

A: It was around – as I remember it, it was '92, '93.

Q: Okay. And who killed him?

A: One of those who shot him, the Somalian people, the one that was making war in the country.

Addendum of Exhibits, Gov't Ex. 6 at 10.

In November, Mr. Hasan testified as follows regarding his brother Sadad's death:

Q: What's the name of your brother that had been killed?

A: Sadad.

Q: What's the name of your brother that was killed in the car wreck?

A: That's – that's Sadad. That's my brother Sadad and the other is Mohammed.

Q: The one that got shot. And what year did he get shot?

A: 1996.

*Id.*, Gov't Ex. 7 at 26.

Count II

Count II rested on the following testimony. At the April hearing, Mr. Hasan testified:

Q: Were you ever tortured in Somalia?

A: What does it mean, tortured?

Q: Did anyone in Somalia do things to you that hurt you physically?

A: Yeah.

Q: What did they do to you?

A: Killing my brother, shot my father, try raping my sister.

*Id.*, Gov't Ex. 6 at 20-21.

In November, Mr. Hasan testified that he had no memory of anything happening to his sister in Somalia:

Q. Did anything happen to your sister in Somalia?

A. No, she – she was – she moved from Somalia a long time ago. She was – she was in Canada.

Q. Okay. But – but when she was in Somalia, did anybody try to do – hurt her?

A. I don't remember because I was staying home always. They always keep me at home.

Q. You don't remember?

A. No.

*Id.*, Gov't Ex. 7 at 32.

<u>Count III</u>

Count III rested on the following testimony. At the April hearing, Mr. Hasan testified:

Q: What injuries did you receive as a result of having been beaten as you now claim?

A: What's that mean?

Q: How were you hurt by being beaten?

A: Just break my teeth and I was trying to run away from them.

*Id.*, Gov't Ex. 6 at 21.

In November, Mr. Hasan testified that although he had been beaten and hit in the mouth, his teeth had not been broken:

Q: What injuries did you receive when they hurt you in Somalia?

A: There is no injury, just beating me up. There was beating up and I had some blood in my mouth.

. . .

Q: Did they break any bones?

A: No.

Q: Did they break any teeth?

A: No.

*Id.*, Gov't Ex. 7 at 33.

<u>Count IV</u>

Count IV, of which Mr. Hasan was eventually acquitted, rested on the following testimony. At the April hearing, Mr. Hasan testified:

Q: All right. So when they asked you in the interview, what is your tribe or clan, you told them Berdirdi?

A: I told them Balkey. Balkey. My family name is Balkey.

*Id.*, Gov't Ex. 6 at 17.

However, in November Mr. Hasan testified that his family name was Fagi.

Q: Okay. What is your family name?

A: Fagi.

Q: How do you spell it?

A: Fagi. I think, F-A-G-I or Y, last letter.

*Id.*, Gov't Ex. 7 at 31.