Robert WILKERSON,
Petitioner-Appellant,

v.

Ross MAGGIO, Jr., Warden, Louisiana State Penitentiary,
Respondent-Appellee.

No. 82–3197
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 25, 1983.

Robert Wilkerson, pro se.

· · J. Marvin Montgomery, Brady Louis Jones, III, Asst. Attys. Gen., Baton Rouge, La., for respondent-appellee.

Before RUBIN, JOHNSON and WILLIAMS, Circuit Judges.

PER CURIAM:

Robert Wilkerson, a pro se petitioner and prisoner in the Louisiana State Penitentiary at Angola, Louisiana, challenges the conditions of his confinement pursuant to 42 U.S.C. § 1983. A United States magistrate heard the case pursuant to 28 U.S.C. § 636(c). After a hearing, the magistrate found that petitioner was not deprived of any right, privilege, or immunity secured by the Constitution or laws of the United States and entered a judgment in favor of the defendant, dismissing plaintiff's suit with prejudice. The plaintiff appealed directly to this Court from the judgment of the magistrate. See 28 U.S.C. § 636(c).

On appeal, Wilkerson contends that certain conditions of confinement at Angola constitute cruel and unusual punishment in violation of the eighth amendment. He claims that (1) prison administrators consistently and maliciously denied him a status change, (2) he was confined to maximum security for eight years without sunshine and outdoor exercise, (3) he was subjected to extreme stress and daily tension resulting in physical deterioration and hypertension, (4) his eyesight was impaired due to poor lighting in his cell, and (5) he suffered irreparable physical and mental damage.

I. *Facts*

Wilkerson was originally sentenced to thirty-five years for armed robbery. He was initially incarcerated in the New Orleans Parish Prison. On August 19, 1970, Wilkerson entered a plea of guilty to a charge of aggravated escape[1] and was sentenced to nine years in the Louisiana State Penitentiary. On April 18, 1972, Wilkerson pled guilty to a charge of aggravated battery[2] on a prison deputy of the New Orleans Parish Prison Annex and was sentenced to seven years in the Louisiana State Penitentiary, to run concurrently with any other sentence imposed on him. After pleading guilty to the charge of aggravated battery, Wilkerson was transferred to the

---

1. At this time, he withdrew his former plea of not guilty. The escape occurred on June 10, 1970.

2. At this time, he withdrew his former plea of not guilty. The battery occurred on April 15, 1971.

Louisiana State Penitentiary in Angola.[3] Upon his arrival, he was temporarily quartered in the Reception Center (RC) pending a security classification which, in turn, determines the quartering assignment. In May 1972, approximately two weeks after his arrival at Angola, he appeared before the Classification Board which classified him as maximum security and assigned quarters in Controlled Cell Reserve (CCR). He has remained in CCR since 1972 except for the two-year period from 1977 to 1979 which he spent in Camp J, another maximum security area.

## II.  *Denial of Status Change*

Wilkerson contends that he has been consistently denied a status change and that there are not valid reasons for keeping him in punitive segregation. Classification of inmates in Louisiana is a duty of the Louisiana Department of Corrections and an inmate has no right to a particular classification under state law. *McGruder v. Phelps,* 608 F.2d 1023, 1026 (5th Cir.1979). It is well settled that "[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status." *Id.* In the instant case, the magistrate concluded that it was not unreasonable or arbitrary to consider Wilkerson a security risk and that his past prison conduct warranted the Reclassification Board's decision to keep him in maximum security. The record clearly supports the court's findings (1) that Wilkerson participated in riots at the penitentiary while in CCR; (2) that he attacked, assaulted, and threatened correctional officers on several occasions; (3) that he was convicted for the murder of another inmate in CCR. In his pro se brief Wilkerson admits the felony conviction for murder, the riots, and the "so-called" attacks. Nonetheless, he argues that these violent acts of aggression should not be considered controlling in a

status determination. Wilkerson, however, does not even attempt to demonstrate why his past prison conduct should not be the major criterion for a status determination. He likewise fails to suggest alternative criteria which a reclassification board could use. Although Wilkerson claims that the Board's review of his case was a "mere sham," the record clearly supports the nonarbitrariness of the Board's decision that Wilkerson represented a security risk. Additionally, Wilkerson makes a conclusory allegation that a prison warden may not put a prisoner in administrative segregation because the warden dislikes the prisoner or desires to punish the prisoner for past misconduct. There is no record support for this allegation.

The court further found that as of July 18, 1978, the Reclassification Board (the Lockdown Review Board) had discussed Wilkerson's case nineteen times.[4] The Board found that on three occasions Wilkerson requested maximum security and that on nine occasions he refused to meet the Board. Wilkerson testified that he never refused to meet the Board but claimed that the officer in charge of the tier collaborated with Officer Blades in refusing to open his cell. Wilkerson, however, never complained to anyone that Officer Blades refused to let him out of his cell to go meet the Board. Moreover, the record of the Board clearly showed that Wilkerson had refused to meet the Board on nine occasions. The record clearly supports the magistrate's conclusion that Wilkerson's past prison conduct justified the decision of the Reclassification Board to keep him in maximum security.

## III.  *Lack of Adequate Sunshine and Outdoor Exercise*

Wilkerson argues that his confinement to maximum security for more than seven years without adequate sunshine and outdoor exercise constitutes cruel and un-

---

3.  He had been transferred to Angola for a short period in the fall of 1971 but was returned to the New Orleans Parish Prison on a court order until April 1972 when he pled guilty to the charge of aggravated battery.

4.  The Lockdown Review Board holds reclassification hearings every three months to review the records of inmates assigned to maximum security and to determine whether the necessity for administrative segregation still exists.

usual punishment in violation of the eighth amendment. The magistrate found that from 1972 to 1977 Wilkerson was not permitted any outdoor exercises but that he was allowed one hour daily outside his cell on the tier to exercise in any manner he desired. The tier was about thirty yards long and the wall of the tier opposite the cells was lined with windows which permitted fresh air to enter the cell block area. The magistrate further found that prison policy changed in October 1978 to permit an inmate who had been in CCR for at least two years to go outside into the yard for forty-five minutes daily and that presently all CCR inmates are permitted one hour a day in the yard. Based on these uncontradicted findings, the magistrate concluded that the inmates in CCR were afforded a meaningful opportunity for exercise for purposes of meeting minimal constitutional requirements.

This conclusion is not erroneous. Wilkerson himself testified that from 1972 to 1977 he exercised on the tier four to five times a week. In addition, he exercised in his cell. Although the exercise yard opened in 1978, Wilkerson could not take advantage of it until 1979 due to the fact that he had been transferred to Camp J. There, he also exercised on the tier. Since October 1979 he has been back in CCR and allowed daily outdoor exercise, weather permitting. The fact that Wilkerson is now allowed daily outdoor exercise makes any claim for injunctive relief moot. The sole question would be whether his lack of outdoor exercise for such an extended period of time constitutes an eighth amendment violation and thereby entitles him to monetary damages. We conclude on this record that the one hour a day of exercise provided on the indoor tier satisfied the constitutional minimum in this case. See *Ruiz v. Estelle,* 679 F.2d 1115, 1151–52 (5th Cir.) (confinement of inmates for long periods of time without opportunity for regular physical exercise may, depending on the facts of each case, constitute cruel and unusual punishment), *modified,* 688 F.2d 266 (1982).[5]

**5.** This Court has previously declined to address the question whether convicted criminals have a constitutional right to outdoor exercise. *See*

### IV. Claims of Hypertension, Poor Eyesight, and Mental and Nervous Problems

■ Wilkerson contends that due to his confinement he suffered extreme stress and daily tension which resulted in his physical deterioration. He argues that prolonged stress can cause permanent damage, both psychological and physical. Dr. Thomas M. Beamon, Medical Director for the Louisiana State Penitentiary at Angola, testified that Wilkerson's medical records indicate only very mild hypertension under control through treatment. Dr. Beamon further testified that it was his medical opinion that Wilkerson's confinement was not the etiology of his hypertension.

Wilkerson also claims that his cell in CCR was so poorly lit that his eyesight was impaired. His witnesses indicated that the lighting in CCR was inadequate, that the lighting was sufficient in the daytime to read, but that at night it was only possible to read near the front of the cell. The defendant's witness, Dr. Beamon, did not contradict this testimony. Dr. Beamon further testified, however, that confinement is not an etiological cause or aggravating condition of myopia. Furthermore, he testified that poor lighting may make it harder for a nearsighted person to read, but that it does not cause or aggravate the condition of myopia itself.

Wilkerson also contends that "he has suffered irreparable damage, mental as well as physical, as a result of his long stay in punitive segregation." This argument is largely repetitious of his claims of hypertension and poor eyesight. Additionally, he alleges mental and nervous problems.

The magistrate found that Wilkerson had presented no evidence of mental impairment. This finding is not clearly erroneous. Moreover, the magistrate found that Wilkerson had failed to establish that it was his "confinement in CCR that [had] caused him

*Miller v. Carson,* 563 F.2d 741, 751 (5th Cir. 1977).

to suffer from mild hypertension and the other alleged ailments." The record clearly supports this conclusion.[6]

This Court concludes that the conditions of Wilkerson's confinement did not constitute cruel and unusual punishment under the eighth amendment. We therefore AFFIRM the magistrate's judgment that Wilkerson has not been deprived of a right secured by the Constitution and laws of the United States.

---

**6.** Wilkerson does not allege an eighth amendment violation based on deliberate indifference to the serious medical needs of prisoners pursuant to *Estelle v. Gamble,* 429 U.S. 97, 104–07, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). His allegations are limited to a mental and physical toll on his body as a result of his prolonged deprivation.