**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 15, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AHMED M. AJAJ,

      Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,
ROBERT A. HOOD, JAMES
BURRELL, DAVID DUNCAN, R.
WILEY, in his official capacity, and
MICHAEL NALLEY, in his official
capacity,

      Defendants-Appellees.

No. 07-1073

(D.C. No. 03-CV-1959-MSK-PAC)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY,** Chief Judge, **BALDOCK**, and **BRISCOE**, Circuit Judges.

---

Plaintiff Ahmed M. Ajaj is a federal prisoner incarcerated at the

Administrative Maximum United States Penitentiary in Florence, Colorado (ADX).

In this prisoner civil rights action, brought pursuant to 28 U.S.C. § 1331 and Bivens,[1]

Plaintiff challenges the conditions of his confinement at ADX, as well as the United

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. The Court will, however,
permit citation of this decision for its persuasive value consistent with Fed. R. App.
P. 32.1 and 10th Cir. R. 32.1.

[1] See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,
403 U.S. 388 (1971).

States Bureau of Prisons' (BOP) failure to provide him notice of, or a hearing concerning, his transfer to ADX in 2002. See Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1230-32 (10th Cir. 2005). Plaintiff appeals from the district court's December 22, 2006 Order Granting Qualified Immunity and Dismissing Claims. We affirm in part, reverse in part, and remand.

I.

Because the district court accurately and thoroughly set forth this case's extensive facts and procedural history, we only set forth this matter's background to the extent necessary to resolve this appeal. See Ajaj v. United States, No. 03-CV-1959-MSK-PAC, 2006 WL 3797871, at *1-5 (D. Colo. Dec. 22, 2006). Plaintiff sued all Defendants in their individual and official capacities, alleging, as relevant here, four claims. Third Am. Compl. ¶8. First, Plaintiff asserted Defendant United States violated the Federal Tort Claims Act (FTCA) in negligently failing to house him in a low-altitude and smoke-free environment contrary to medical instructions (Claim 1). Second, Plaintiff averred Defendants Hood, Burrell, Wiley, and Nalley (the Federal Officers) violated the Eighth Amendment by failing to protect Plaintiff from an unreasonable risk of harm by failing to move him to a low altitude, smoke-free housing assignment, contrary to prescribed medical instructions (Claim 2). Third, Plaintiff claimed that the Federal Officers violated the Eighth Amendment by acting with deliberate indifference to Plaintiff's conditions of confinement at ADX (*i.e.*, limitations on his property rights, mail, access to telephones and recreation,

2

lock-down 23 hours per day, extreme isolation, imposition of discipline for minor offenses, noise, and the indefinite nature of his confinement) (Claim 3(A)). Fourth, Plaintiff asserted Defendant Hood deprived him of a liberty interest by transferring Plaintiff to ADX without notice or a hearing, and also by continuing to confine him there for an indefinite duration without the ability to meaningfully challenge his placement (*i.e.*,without admittance to ADX's "step-down program") (Claim 3(B)).[2] Therein, Plaintiff sought compensatory damages and injunctive relief. Third Am. Compl. at 17-18.

The Federal Officers moved for summary judgment on "all claims." App. at 178. The district court subsequently issued an Order Granting Qualified Immunity and Dismissing Claims. The Order granted the Federal Officers' motion in its entirety, save Plaintiff's official capacity claim under Claim 3(B) to the extent it sought admittance to ADX's step down program. Ajaj, 2006 WL 3797871, at *12 (stating that the "*sole claim* remaining for trial is Claim 3(B) (denial of procedural due process *with regard to ADX step downs*) against [the Federal Officers] . . . in

---

[2] As the district court explained:
ADX has a stratified housing system which allows inmates to progress through a step-down program from the most restrictive to the least restrictive housing assignment . . . . Ordinarily, inmates are automatically assessed every six months for purposes of determining whether they should progress . . . . [Plaintiff] contends that he has repeatedly been denied step downs [despite meeting all of the step down criteria as of January 2005] . . . .
Ajaj, 2006 WL 3797871, at *5.

3

their official capacities." (emphasis added)). On January 4, 2007, BOP placed Plaintiff in ADX's step-down program. As such, the parties submitted a Fed. R. Civ. P. 41(a)(1)(ii) stipulation to dismiss Claim 3(B).[3] Ajaj, No. 03-CV-1959-MSK-PAC, Doc. #270, at ¶9 (filed 2/22/07) (agreeing that Plaintiff's placement in ADX's step-down unit program meant he had obtained "the remedy available pursuant to the . . . December 22, 2006 Order . . . under [C]laim 3(B)"). Pursuant to the parties' stipulation, the district court dismissed Claim 3(B) without prejudice and directed the clerk to close the case. See Ajaj, No. 03-CV-1959-MSK-PAC, Doc. #271, at 1 (filed 2/23/07). Plaintiff appeals.

## II.

We review "de novo a district court's decision regarding qualified immunity." Amundsen v. Jones, 533 F.3d 1192, 1198 (10th Cir. 2008). Under the summary judgment standard, we generally review the evidence in the light most favorable to the nonmoving party. See Nelson v. McMullen, 207 F.3d 1202, 1205 (10th Cir.

---

[3] The district court's February 23, 2007 Order dismissed Claim 3(B) without prejudice. On February 20, 2007, Plaintiff filed a Notice of Appeal providing that "Plaintiff . . . hereby appeal [sic] . . . from an Order Granting Qualified Immunity and Dismissing Claims entered in this action on the 22nd day of December, 2006." Because Claim 3(B) remained viable in the district court, , however, Plaintiff's Notice of Appeal was premature. See Heimann v. Snead, 133 F.3d 767, 768-69 (10th Cir. 1998). Accordingly, we issued a jurisdictional show cause order. The district court — at the parties' request — subsequently dismissed Plaintiff's Claim 3(B) *with* prejudice. As such, Plaintiff's February 20, 2007 Notice of Appeal ripened with the district court's entry of its dismissal of Claim 3(B). Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002); Lewis v. B.F. Goodrich Co., 850 F.3d 641, 645-46 (10th Cir. 1988) (en banc).

2000). Yet, when "qualified immunity is raised in a summary judgment motion, . . . [this Court applies] special rules to determine whether the motion was properly granted or denied." Reynolds v. Powell, 370 F.3d 1028, 1030 (10th Cir. 2004) (quotations omitted). Because the Federal Officers raised qualified immunity, Plaintiff "bears the initial burden of proving": (1) the Federal Officers' conduct violated a constitutional right; and (2) this right was clearly established at the time the conduct at issue occurred. Amundsen, 533 F.3d at 1198. If Plaintiff makes this showing, the burden shifts back to the Federal Officers to demonstrate no genuine issues of material fact exist and they are entitled to judgment as a matter of law. Id. The Federal Officers prevail, however, if Plaintiff fails to carry the initial twofold burden. Id. To be clear, a "qualified immunity defense is only available to parties sued in their individual capacity." Beedle v. Wilson, 422 F.3d 1059, 1069 (10th Cir. 2005); Hammons v. Saffle, 348 F.3d 1250, 1257 (10th Cir. 2003). Hence, on summary judgment, official capacity claims for prospective injunctive relief are subject to normal Fed. R. Civ. P. 56(c) standards.

## III.

Plaintiff first argues that the district court erred in granting summary judgment to the Federal Officers on his Eighth Amendment failure to protect claim (Claim 2). Claim 2 averred that the Federal Officers failed to act in accordance with prescribed medical treatment or exposed Plaintiff to an unreasonable risk of harm by not moving him to a low-altitude and smoke-free prison assignment. Plaintiff contends

5

that, contrary to the district court's conclusion, he marshaled sufficient evidence to withstand summary judgment. The Federal Officers, however, maintain Plaintiff failed to demonstrate their conduct violated Plaintiff's constitutional rights.

To establish an Eighth Amendment inadequate medical care claim, Plaintiff must establish that the Federal Officers acted with "deliberate indifference to an inmate's serious medical needs." Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005); see Estelle v. Gamble, 429 U.S. 97, 103 (1976). Deliberate indifference in the Eighth Amendment context encompasses an objective and subjective prong. Namely, "the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." Smith v. Cummings, 445 F.3d 1254, 1257 (10th Cir. 2006) (quotation omitted). Hence, to satisfy the objective prong, Plaintiff must demonstrate that the medical needs he avers the Federal Officers neglected are "sufficiently serious" to satisfy the objective element. Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006). Meeting the subjective prong requires Plaintiff demonstrate "sufficiently culpable" states of mind on the Federal Officers' part. Id.

"A medical need is serious if it has been diagnosed by a doctor or is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996) (quotation omitted)

6

("Conduct which, at most, is medical malpractice redressable in state court does not represent cruel and unusual punishment."). Failure to act in accordance with or intentional interference with *prescribed* medical treatment or instructions can give rise to an Eighth Amendment claim. Estelle, 429 U.S. at 104-05.

First, Plaintiff has failed to satisfy the objective prong regarding ADX's altitude. Like the district court, our review of the record reveals no evidence that the Federal Officers contravened medical instructions by placing and continuing to house him at ADX, rather than at a low-altitude prison. A 1998 "Transfer Summary" — signed by a psychiatrist and psychologist at BOP's medical facility in Springfield, Missouri, following Plaintiff's left pneumonectomy — is not to the contrary. That record provides: "[Plaintiff] will experience limited exercise capacity at facilities more than 2,000 feet above sea level and *should be considered* for facilities with elevations lower than that." App. at 593 (emphasis added). While the 1998 record recommended Plaintiff be considered for a low-altitude housing assignment, the physicians in no way indicated that such a placement was medically *necessary* or otherwise required. Hence, Plaintiff's placement and continued confinement at ADX does not contravene medical instructions or pose an unreasonable risk of harm.

Indeed, Plaintiff's treating physician at ADX never indicated that Plaintiff's health required a low-altitude housing placement. Although BOP authorized Plaintiff to undergo pulmonary function testing by an independent pulmonologist, the procedure yielded normal results, indicating that Plaintiff was "adequately

7

compensating at [ADX's] altitude." App. at 588. Other medical records reveal that Plaintiff's treating physician at ADX considered him to generally be in "excellent health." App. at 579; see also id. at 555-56, 626-27. Finally, Plaintiff's own medical expert opined in his deposition testimony that he "d[id] not believe [Plaintiff] need[ed] to be moved to a lower altitude."[4] App. at 729 (deposition testimony of Dr. Dennis Clifford). As such, the Federal Officers are entitled to qualified immunity in regard to Plaintiff's Eighth Amendment claim related to ADX's altitude.

Second, even assuming without deciding Plaintiff sufficiently evidenced that his exposure to second-hand or environmental tobacco smoke (ETS) at ADX, before it became a smoke-free facility, was sufficiently serious to meet the objective prong of the Eighth Amendment test, qualified immunity in regard to this claim is also appropriate.[5] See United States v. Hasan, 526 F.3d 653, 663 (10th Cir. 2008) (noting

---

[4] We note that, in addressing Plaintiff's physical and mental health, his January 25, 2005 BOP Progress Report notes — without any further explanation — he has "an altitude restriction." App. at 695. The district court's order makes no reference to this document. Because (1) neither party mentions or explains the significance of this reference, and (2) there is a dearth of evidence that Plaintiff required a low-altitude housing assignment, the annotation in the Progress Report does not give us pause. See Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[5] We note that the district court found ADX became a smoke-free facility in July 2005, while the Federal Officers maintain "ADX became a smoke-free facility" in November 2004." Compare Ajaj, 2006 WL 3797871, at *4, with Appellees' Resp. Br. at 8. Because this factual discrepancy is not outcome determinative here, we

(continued...)

that we may "affirm a district court for any reason supported by the record"). Plaintiff simply has not shown the Federal Officers acted with deliberate indifference to his requests for a smoke-free environment. Undoubtedly, the record evidences medical instructions that Plaintiff should be placed in non-smoking housing. See App. at 556, 569-70, 579, 591; see also id. at 729. In response to Plaintiff's complaints of smelling ETS in his cell, his treating physician at ADX, Dr. Leyba, was unable to confirm or disprove Plaintiff's symptoms of reactions to ETS. He recommended Plaintiff be moved to a non-smoking unit in ADX. Id. Though not dispositive, given ADX's unique role in the federal prison system, we believe the fact Dr. Leyba never sought a medical transfer for Plaintiff out of ADX on Plaintiff's behalf notable.

Further, far from ignoring Plaintiff's complaints, or the recommendations of Dr. Leyba, the Federal Officers responded by investigating Plaintiff's complaints and trying to accommodate his needs, within the high-security ADX setting. App. at 417 (noting that ADX "is the most secure prison in the federal system" with "unique security and control procedures"). For instance, Defendant Duncan, an ADX Associate Warden, testified that he responded to Plaintiff's complaints by coordinating with ADX's facilities personnel and Plaintiff's ADX physician. With their aid, Defendant Duncan undertook an investigation into whether Plaintiff could

_____

(...continued)
decline to resolve it. See Cooperman, 214 F.3d at 1164.

9

— as he maintained — be exposed to ETS and, if so, how to minimize any such exposure. App. at 587. Defendant Duncan testified that the investigation revealed that ADX's air filtration system was such that Plaintiff could be exposed to ETS. App. at 587 (explaining that four cells are connected together and that ETS could pass between the cells). Accordingly, Duncan stated no inmates who smoked were housed in any of the three cells adjoining Plaintiff's cell.

Additionally, in early 2003, ADX installed air filters in Plaintiff's cell. Plaintiff's Unit Manager noted in a memo to Defendant Burrell that Plaintiff told the ADX Facilities Manager that, although he continued to complain about ETS, "the filter had helped him." App. at 667. Further, Defendant Hood testified to the best of his knowledge Plaintiff was placed "on a range with either no smokers or, if any, [Plaintiff was placed] at the far end of the range" where the cells' configuration precluded his exposure to ETS. App. at 650. True, a June 2004 memo from a BOP official to an ADX administrator continued to draw attention to this issue. But the document reflects that the official's concern, regarding Plaintiff not having been assigned to a smoke-free unit, was driven more by Plaintiff's litigiousness than by concern for his ETS exposure. Id. at 588; see generally Self v. Crum, 439 F.3d 1227, 1232 (10th Cir. 2006) ("A claim is . . . actionable only in cases where the need for additional treatment . . . is *obvious*." (emphasis added)).

In short, the record adduces no indication the Federal Officers disregarded "a known or obvious consequence" of their actions, Bd. of County Comm'rs of Bryan

10

County v. Brown, 520 U.S. 397, 410 (1997), nor "an excessive risk to [Plaintiff's] health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); see also Estelle, 429 U.S. at 105-06 (inadvertence does not satisfy the subjective prong of an Eighth Amendment claim regarding federal officers' conduct); cf. Self, 439 F.3d at 1232 (subjective deliberate indifference would be demonstrated where "*e.g.*, a patient complains of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing . . . [nevertheless] sends the inmate back to his cell."). As such, Plaintiff cannot satisfy the subjective prong of our Eighth Amendment analysis and the Federal Officers are entitled to qualified immunity on this claim. See Self, 439 F.3d at 1232-33.

IV.

Plaintiff also appeals the district court's sua sponte dismissal of his claim under the Federal Tort Claims Act (Claim 1). In support of his position, Plaintiff points to medical instructions that stated he "would function better" in a low-altitude environment and should be assigned to smoke-free housing. See Appellant's Br. at 33. The district court dismissed Claim 1 sua sponte, deeming it premised on the same facts as Claim 2. Ajaj, 2006 WL 3797871, at *12; see also supra Part.III. Whether the district court made this determination under the motion to dismiss standard, or pursuant to the summary judgment standard, is unclear from the district court's cursory ruling. See id.

Under the FTCA, the law of the place where the allegedly negligent or

11

wrongful act occurred "determines the legal basis for liability." See Gundy v. United States, 728 F.2d 484, 487 (10th Cir. 1984). Here, Colorado law governs and directs that, as with any common law negligence claim, "a claimant alleging negligence of another party must establish the existence of a duty, a breach of that duty, causation, and damages." Redden v. SCI Colo. Funeral Servs., Inc., 38 P.3d 75, 80 (Colo. 2001) (en banc). We have previously stated that while "Colorado courts have not yet addressed whether prison officials owe a duty of care to inmates regarding their medical needs," if specifically presented with the question, we believe Colorado law would impose a duty of care on prison officials to "protect[] inmates' health and safety." Kikumura v. Osagie, 461 F.3d 1269, 1301 (10th Cir. 2006), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007); see also Restatement (Second) of Torts §●● 314(a)(4) (1965).

Regarding Plaintiff's need for a low-altitude placement, as discussed above, the record is devoid of medical records recommending such an accommodation. In contrast, the record reflects that Plaintiff's treating physician at ADX clearly recommended Plaintiff reside in a smoke-free unit. As a general matter, prison administrators do not breach their duty of care when an inmate is placed in an environment where that inmate will be exposed to ETS in reasonable quantities. See Friedman v. United States, 87 F. App'x 459, 462 (6th Cir. 2003) (finding no negligence in prison officials' failure to prevent inmate's exposure to ETS where no evidence existed that exposure to smoke exacerbated inmate's pre-existing medical

12

condition). But where an inmate possesses an obvious medical need for housing in a smoke-free environment, and prison administrators fail to respond to that need, the inmate may have a viable negligence claim as a result of the alleged breach of care. As such, an FTCA inmate-plaintiff alleging a particular medical need for smoke-free housing, like Plaintiff, may potentially demonstrate a breach of the duty of care when the United States fails to place that inmate in a completely smoke-free environment.

Here, Plaintiff alleges the United States breached that duty when he was not placed in a completely smoke-free environment, and that this breach was the "direct and proximate cause of serious, permanent and continuing injuries to Mr. Ajaj." Third Am. Compl. ¶70; see also id. ¶¶63-64, 66. The record reflects ADX personnel attempted to discern and minimize Plaintiff's exposure to ETS. See supra Part. III. But the record was only developed in relation to Plaintiff's other claims (*i.e.*, the claims at issue in the Federal Officers' summary judgment motion), not his FTCA claim. Further, whether the district court's short and vague sua sponte dismissal of Claim 1 employed the motion to dismiss standard, or the summary judgment standard, remains unclear. In any event, concluding that these alternative steps foreclose Plaintiff's claim, at this juncture, would ignore the basic allegation Plaintiff asserts in his FTCA claim regarding ETS, i.e., that regardless of any other accommodations the prison administrators made, the United States breached its duty of care by not placing Plaintiff in *completely* smoke-free housing. See Third Am. Compl. ¶70.

13

The district court may ultimately conclude ADX personnel acted reasonably, and find that by investigating Plaintiff's complaints, placing non-smoking inmates in the cells adjoining Plaintiff's, and installing a special air filter, the United States satisfied the duty owed to Plaintiff. But whether anything short of placing Plaintiff in a completely smoke-free environment was a breach of Defendants' duty of care may not be adjudged at this early stage of litigation.[6] We therefore conclude Plaintiff's allegations are adequate to warrant further proceedings on Claim 1.

V.

Next, Plaintiff appeals the district court's ruling on his Eighth Amendment conditions of confinement claim (Claim 3(A)). Claim 3(A) asserts that the following conditions of Plaintiff's ADX confinement amount to "atypical and significant hardships," as compared to the general population: (1) limitations on his property rights, mail, access to telephones, and recreation; (2) lock-down for 23 hours per day in extreme isolation; (3) imposition of discipline for minor offenses; (4) noise;

---

[6] For clarity's sake, we note that concluding Plaintiff's FTCA claim remains tenable is entirely consistent with concluding that his Eighth Amendment deliberate indifference claim is appropriate for summary judgment. To sustain an Eighth Amendment deliberate indifference claim a "plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm . . . *and* that the prison official was deliberately indifferent to his safety." See supra Part. III (emphasis added) (quoting Smith, 445 F.3d at 1257). We concluded above that ADX personnel's efforts to minimize Plaintiff's ETS exposure demonstrated they did not act with deliberate indifference to Plaintiff's requests for a smoke-free environment (*i.e.*, the second requirement of an Eighth Amendment claim). The FTCA, of course, does not implicate any such inquiry into prison officials' "state of mind." See Kikumara, 461 F.3d at 1293; see also id. at 1301.

14

(5) lights which remain on in his cell 24 hours per day; and (6) his indefinite confinement at ADX.

"The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). As stated above, Plaintiff bears the burden of showing, first, that his conditions of confinement are, objectively, sufficiently serious, and, second, that the Federal Officers were deliberately indifferent to his safety. See id. The district court granted summary judgment to the Federal Officers, concluding Plaintiff failed to show that the conditions of his ADX confinement are sufficiently serious. Specifically, the district court noted that, although Plaintiff took issue with numerous conditions of his confinement, his summary judgment response referenced record evidence only in regard to his limited ability to exercise outdoors and his indefinite confinement at ADX. Ajaj, 2006 WL 3797871, at *9. The district court ultimately deemed Plaintiff's evidence of these conditions inadequate to withstand summary judgment. See id.

On appeal, Plaintiff contends that his deposition testimony, which he submitted as an attachment to his summary judgment response, evidenced all the conditions of confinement set forth in Claim 3(A). Principally, Plaintiff's briefing underscores his restricted access to outdoor exercise and the indefinite nature of his

15

detention at ADX. The Federal Officers respond that the conditions of confinement Plaintiff complains of are not, as a matter of law, sufficiently serious to maintain his Eighth Amendment claim.

Undoubtedly:

> It is important to consider the conditions of confinement as a whole because several deprivations "in combination" may constitute a constitutional violation "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets."

Mitchell v. Maynard, 80 F.3d 1433, 1442 (10th Cir. 1996) (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991)). But equally true is that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Wilson, 501 U.S. at 305; accord Gillis v. Litscher, 468 F.3d 488, 493 (7th Cir. 2006) ("Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so. This is true when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth . . . .").

Quite simply, save Plaintiff's allegations regarding his access to exercise, the conditions of confinement he avers do not, even taken together, constitute the sort of "significant departure from the healthy habilitative environment the state is required to provide its inmates." See Mitchell, 80 F.3d at 1442; see, e.g., Ramos v.

16

<u>Lamm</u>, 639 F.2d 559, 568 (10th Cir. 1980) (inmate must be provided with "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing)"). <u>Compare</u> <u>Gillis</u>, 468 F.3d at 493 (ruling qualified immunity inappropriate on Wisconsin supermax inmate/plaintiff's Eighth Amendment claim where conditions of his confinement included: "denial of shelter, heat, and hygiene items implicated an inmate's constitutional rights"), <u>with</u> Third Am. Compl. ¶73, <u>and</u> <u>Ruark v. Solano</u>, 928 F.2d 947, 949 (10th Cir. 1991) (concluding an inmate's allegations that his cell was small and noisy, that his movement outside his cell was severely restricted, and that he enjoyed very limited visitation did not implicate the Eighth Amendment).

Regarding Plaintiff's access to exercise, we recognize:

that some form of regular outdoor exercise is extremely important to the psychological and physical well being of inmates, and some courts have held a denial of fresh air and exercise to be cruel and unusual punishment under certain circumstances.

<u>Fogle v. Pierson</u>, 435 F.3d 1252, 1260 (10th Cir. 2006) (quotation omitted); <u>see also</u> <u>Housley v. Dodson</u>, 41 F.3d 597, 599 (10th Cir. 1994) ("Although no precise standards have been set forth delineating what constitutes constitutionally sufficient opportunities for exercise, the right to some exercise was clearly established at the time of Mr. Housley's confinement."), <u>abrogated on other grounds by</u> <u>Lewis v. Casey</u>,518 U.S. 343 (1996); <u>Bailey v. Shillinger</u>, 828 F.2d 651, 653 (10th Cir. 1987) (while restrictive, limiting inmate, who was assigned to high-security segregation

17

unit, to one hour per week in outdoor exercise facility, without more, did not rise to level of an Eighth Amendment violation).

Here, Plaintiff asserts he was denied access to outdoor recreation his first year at ADX. But this deprivation of outdoor recreation is not sufficiently serious to implicate the Eighth Amendment. See Fogle, 435 F.3d at 1260 (holding that "a factfinder might conclude that the risk of harm from *three years* of deprivation of any form of outdoor exercise was obvious and that [prison] officials disregarded that risk by keeping Fogle in administrative segregation" (emphasis added)); see also Bailey, 828 F.2d at 653 (recognizing that courts have not deemed the denial of fresh air and exercise to be a "per se" Eighth Amendment violation).

Plaintiff also argues that, even after his first year at ADX, he is inconsistently afforded outdoor recreation. He asserts outdoor recreation is regularly cancelled due to inclement weather or staffing issues. Even assuming such allegations implicate the Eighth Amendment, the record clearly reflects that Plaintiff regularly declined opportunities to recreate outdoors. App. at 736 , 739-805. As such, Plaintiff failed to evidence a constitutional violation and, thus, the Federal Officers are entitled to qualified immunity on Claim 3(A).

VI.

Lastly, Plaintiff maintains that his procedural due process claims related to his 2002 transfer to ADX (Claim 3(B)) — the first against Defendant Hood in his

18

individual capacity for monetary damages, and the second against Defendants Hood,

Nalley, and Wiley, in their official capacities for injunctive relief — remain viable.[7]

For the reasons that follow, we conclude that none of Plaintiff's procedural due

process claims can withstand summary judgment.[8]

A.

Plaintiff appeals the district court's grant of qualified immunity to Defendant

Hood regarding his 2002 transfer to ADX.  Therein, Plaintiff argues that his

protected liberty interest in avoiding assignment to ADX was clearly established in

2002, thus entitling him to some form of legal process before his transfer.  See

---

[7] The Federal Officers also argue that Plaintiff's due process claim against Defendant Hood must fail because he was not personally involved in Plaintiff's transfer to ADX.  Because, as discussed below, we conclude Plaintiff's due process claims fail in any event, we need not reach this issue.

[8] Because confusion remained regarding the nature, contours, and continued viability of Plaintiff's official capacity due process claim, we ordered the parties to clarify their positions on the issue.  In their supplemental response, the Federal Officers raise — for the first time in this litigation — Ajaj v. Smith, 108 F. App'x 743 (4th Cir. 2004) (per curiam).  The Federal Officers argue that issue preclusion or collateral estoppel precludes our consideration of Plaintiff's due process claims.  Plaintiff replies that the Federal Officers waived the affirmative defense because they failed to timely assert it, noting that he referenced the District of South Carolina case's docket number in his response to the Federal Officers' request for production of documents.  A party's failure to raise the affirmative defense of issue preclusion generally waives the issue.  See Fed. R. Civ. P. 8(c); see also Pittsburg County Rural Water Dist. No. 7 v. City of McAlester, 358 F.3d 694, 708 n.4 (10th Cir. 2004).  We have no difficulty concluding here that the Federal Officers waived the res judicata issue by — inexplicably — failing to apprise the Court of the Fourth Circuit's decision until the *thirteenth* hour — i.e., its court-ordered supplemental response brief.

<u>Sandin v. Connor</u>, 515 U.S. 472, 485-86 (1995). Defendant Hood counters that Plaintiff's transfer to ADX, even assuming ADX affords less amenable and more restrictive quarters than those Plaintiff had at FCI Edgefield's administrative segregation unit, does not implicate a liberty interest protected by the Due Process Clause. In any event, the Federal Officers maintain such a liberty interest was not clearly established in 2002 as evidenced by <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005), decided over two years *after* Plaintiff's 2002 transfer. Plaintiff replies that <u>Wilkinson</u> did not change the law, but rather applied the clearly established law of <u>Sandin</u>. Because we conclude that any protected liberty interest Plaintiff might have in avoiding transfer to ADX was not clearly established in 2002, Defendant Hood is entitled to summary judgment.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." <u>Wilkinson</u>, 545 U.S. at 221. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies." <u>Id.</u> "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." <u>Id.</u> (citing <u>Meachum v. Fano</u>, 427 U.S. 215, 225 (1976)). But "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in <u>Sandin</u> [v.

20

Conner]."  Id.  Sandin clarified that, in determining whether state policies and regulations give rise to a liberty interest, courts must focus on the nature of "the interests allegedly created by the State."  Sandin, 515 U.S. at 480 (disavowing the approach taken in a series of previous cases in which the Court "wrestled with the language of . . . prison guidelines to determine whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's conditions of confinement").

Sandin addressed whether a Hawaii prison inmate had a protected liberty interest in avoiding thirty days' confinement in segregation as punishment for disruptive behavior.  In considering the issue, the Supreme Court focused on whether thirty days in segregation "impose[d] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484. Therein, the Court undertook a "comparison between inmates inside and outside disciplinary segregation."  Id. at 486.  Ultimately, the Sandin Court concluded that the thirty days in segregation "did not work a major disruption in his environment," nor did it "inevitably affect the duration of his sentence."  Id. at 486-87.  As such, the Court held that the conditions "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  Id. at 486 (noting that at the time of one inmate's punishment "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in

21

administrative segregation and protective custody"). To the contrary, thirty days in segregation was "within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." Id. at 487.

Seeking to show his right to process before his transfer to ADX, a supermax facility, Plaintiff relies on the Supreme Court's 2005 Wilkinson decision, which considered what process (if any) an inmate is entitled to upon being considered for placement at the Ohio State Penitentiary supermax facility (OSP). See Wilkinson, 545 U.S. at 220-22 (addressing the threshold inquiry of whether the inmates established a constitutionally protected liberty interest and concluding that they had, but later holding that the inmates received due process). According to Plaintiff, we may look to Wilkinson even though it was handed down after his 2002 transfer because it simply applied Sandin's clearly established rule to the supermax context.

Wilkinson expressly provides otherwise. The Wilkinson court recognized:

> In Sandin's wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system. This divergence indicates the difficulty of locating the appropriate baseline, an issue that was not explored at length in the briefs.

Wilkinson, 545 U.S. at 223 (collecting cases); accord Jordan v. Fed'l Bureau Prisons, 191 F. App'x 639, 650-51 (10th Cir. 2006) ("[T]he circuit courts are split on which baseline comparison" — i.e., whether conditions, duration or restrictions of confinement are atypical as compared with other inmates "in the same segregation"

22

or the "general prison population" — "to use."). Indeed, we have acknowledged that our own opinions have "inconsistently used comparisons either with inmates in the same segregation or those in the general prison population." Jordan, 191 F. App'x at 650 (citation omitted). Furthermore, regardless of the baseline employed, like the majority of our sister Courts of Appeal, we have "never held the conditions, duration or restrictions of the detentions presented on appeal created a liberty interest . . . ." Id. at 650-51 & nn.9-10 (collecting cases). This confusion and divergence evidences that Sandin's rule continues to evolve, even after Wilkinson. Thus, we have no qualm in concluding that the law was not clearly established as to whether Plaintiff had a protected liberty interest in avoiding transfer to ADX in 2002. See Saucier v. Katz, 533 U.S. 194, 202 (2001) (acknowledging that the "dispositive inquiry" in determining whether a right was clearly established "is whether it would be clear to a reasonable officer that his conduct was unlawful in the [particular] situation"); see also Jiron v. City of Lakewood, 392 F.3d 410, (10th Cir. 2004) (qualified immunity "is designed to 'protect all but the plainly incompetent or those who knowingly violate the law'" (citation omitted)). Defendant Hood is therefore entitled to qualified immunity regarding Plaintiff's transfer to ADX.

## B.

Next, Plaintiff maintains he has an extant official capacity claim for injunctive relief regarding his initial transfer to ADX. Nothing in the evidence suggests,

however, that the district court ever ruled on the merits of this claim. See, e.g., Ajaj, 2006 WL 3797871, at *9-11 (although in considering Claim 3(B) the district court expressly stated Plaintiff "retain[ed] his official capacity claim" against Defendants Hood, Nalley, and Wiley, the district court never expressly referenced, analyzed, or ruled on Plaintiff's official capacity claim related to his 2002 transfer to ADX). The district court, quite reasonably, may have assumed Plaintiff had abandoned this claim. For instance, though the district court granted the Federal Officers leave to file a summary judgment motion only as to qualified immunity during a July 2006 hearing, Plaintiff gave no indication that he maintained an official capacity claim for injunctive relief. See App. at 176-77; see generally Simmat, 413 F.3d at 1231 ("There is no such animal as a Bivens suit against a public official tortfeasor in his or her official capacity."); Beedle, 422 F.3d at 1069 ("[Qualified immunity] is only available to parties sued in their individual capacity."). Nor did Plaintiff's summary judgment response make substantive arguments in support of, or otherwise make clear that he continued to prosecute, an official capacity claim related to his ADX transfer under Claim 3(B). See App. 480-504. In any event, and most importantly, our review of the record indicates that — despite having ample opportunities to do so — Plaintiff has never challenged the district court's view that its December 22, 2006 Order disposed of "all claims" save Claim 3(B) as to the step-down program.

An "issue must be presented to, considered by, and decided by a trial court before it can be raised on appeal." Id. (quotation omitted). See Tele-Commc'ns, Inc.

24

v. Comm'r of Internal Revenue Serv., 104 F.3d 1229, 1232-33 (10th Cir. 1997) ("In order to preserve the integrity of the appellate structure, we should not be considered a 'second-shot' forum . . . where secondary, back-up theories may be mounted for the first time."). This principle's import is particularly pronounced here where the claim at issue is one for injunctive relief arising out of the penal context. See generally Jones v. Salt Lake County, 503 F.3d 1147, 1153-54 (10th Cir. 2007) (recognizing significant deference to the "informed discretion of corrections officials" is warranted when accommodating an inmate's asserted constitutional right will materially affect other inmates or prison staff). Put simply, because Plaintiff failed to preserve his official capacity claim for injunctive relief related to his 2002 transfer to ADX for appeal, we will not address it here for the first time on appeal. See Simmat, 413 F.3d at 1240.[9]

---

[9] Although ADX admitted Plaintiff to the step-down program in 2007, he appeals the district court's grant of qualified immunity to Defendant Hood on this Bivens claim (Claim 3(B)). Assuming arguendo Plaintiff had any protected liberty interest in admittance to the step down program, such a right was not clearly established at the time of Defendant Hood's allegedly wrongful conduct. As discussed above, the rule of Sandin continued to evolve even after Wilkinson. Defendant Hood is, therefore, entitled to qualified immunity. See Hasan, 526 F.3d at 663.

For the foregoing reasons, the district court's judgment is **AFFIRMED IN PART**, **REVERSED IN PART**, and **REMANDED** for further proceedings as stated herein.

> Entered for the Court
>
> Bobby R. Baldock
> United States Circuit Judge

**HENRY**, Chief Judge, concurring:

I concur in the majority's disposition of Mr. Ajaj's conditions of confinement claim (Claim 3A) because the record and the pleadings before the district court convince me that this deprivation does not violate the Eighth Amendment. As the majority explains, review of the record makes clear that the appellant regularly declined outdoor exercise opportunities. Also, he was allowed indoor recreation. However, I write separately to encourage the government to re-examine its proffered view of the exercise issue and, in particular, outdoor exercise.

On appeal, the government argues, "Ajaj appears to complain chiefly about the restrictions on outdoor recreation, *alleging he was denied outdoor exercise for the first year at ADX*, and not consistently allowed since. However, on its face, this fails to state a claim." Aple's Br. at 25 (emphasis added). The government's assertion that a prisoner, even one in administrative segregation, may not make out an Eighth Amendment claim by alleging a one-year deprivation of outdoor exercise is challenged by our caselaw. Furthermore, the government's statement and its terse argument were unnecessary under the facts of this case.[1] I agree that, due to Mr. Ajaj's failure to substantiate his claims adequately, the defendants were entitled to qualified immunity in this case. However, a prisoner who has been deprived of

---

[1] The government adds, "[T]he record demonstrates that the main reason he has had less outdoor exercise is that he has refused it." Aple's Br. at 25. This opaque reference to the record concludes the government's short discussion of Mr. Ajaj's alleged deprivation of outdoor exercise.

outdoor exercise for one year – especially one with health issues whose doctor has recommended outdoor exercise – *could* make out an Eighth Amendment claim under the summary judgment standard of review.

Clearly, the Eighth Amendment "does not mandate comfortable prisons," *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). However, as a general rule, prisoners are entitled to some out-of-cell exercise. In *Housley v. Dodson*, we held that an inmate alleged an Eighth Amendment violation by claiming to have been afforded only thirty minutes of out-of-cell exercise over the course of three months. 41 F.3d 597, 599 (10th Cir. 1994), *overruled on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). We noted, "[T]here can be no doubt that total denial of exercise for an extended period of time would constitute cruel and unusual punishment prohibited by the Eighth Amendment." *Id.* at 599. *Housley* further explained that "a failure to provide inmates (confined for more than a short a very short period . . . ) with the opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions." *Id.* (internal quotation marks omitted).

Several of our sister circuits have also expressed the view that prisoners are entitled to out-of-cell recreation. For example, the Ninth Circuit has noted that "exercise has been determined to be one of the basic human necessities protected by the Eighth Amendment." *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005)

(internal quotation marks omitted). The Seventh Circuit has observed that "exercise is no longer considered an optional form of recreation, but is instead a necessary requirement for physical and mental well-being." *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001) (finding that prison officials were not entitled to qualified immunity where an inmate in segregated housing alleged a six-month deprivation of out-of-cell exercise). Indeed, "exercise is now regarded in many quarters as an *indispensable component of preventative medicine*." *Id.* (emphasis added); *see also Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) ("We have no difficulty concluding that [three-and-half years' deprivation of out-of-cell exercise] would run afoul of the Eighth Amendment."); *Rodgers v. Jabe*, 43 F.3d 1082, 1087 (6th Cir. 1995) ("[R]estrictions on exercise may violate the Eighth Amendment under some circumstances."); *Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir. 1992) ("[A] total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees."); *Ruiz v. Estelle*, 679 F.2d 1115, 1152 (5th Cir. 1982) ("Although deprivation of exercise is not per se cruel and unusual punishment, in particular circumstances a deprivation may constitute an impairment of health forbidden under the [E]ighth [A]mendment." (internal quotation marks omitted)), *vacated in part on other grounds by* 688 F.2d 266 (5th Cir. 1982).

Federal Bureau of Prisons (BOP) regulations recognize the importance of recreation, both indoor and outdoor. According to BOP regulations, even inmates housed in "control units" – *i.e.*, inmates "who are unable to function in a less

-3-

restrictive environment," 28 C.F.R. § 541.40 – must have an "opportunity to receive a minimum of seven hours weekly recreation outside of the cell." *Id.* at § 541.46(e). The regulations also provide that "staff [in control units] may offer outdoor recreation to inmates, weather permitting."  Federal Bureau of Prisons, Program Statement No. 5212.07 (Control Unit Programs), at 12 (supplying commentary for 28 C.F.R. § 541.46(e)(1)), *available at* http://www.bop.gov/DataSource/execute/dsPolicyLoc.  The American Correctional Association's *Standards for Correctional Institutions*, a publication referenced in the BOP regulations governing the recreation of general population prisoners,[2] recommends that inmates be provided with ample space for indoor and outdoor recreation.  *See* AMERICAN CORRECTIONAL ASSOCIATION, STANDARDS FOR ADULT CORRECTIONAL INSTITUTIONS 43, 74 (4th ed. 2003); Federal Bureau of Prisons, Program Statement No. p5370-70, Inmate Recreation Programs 3 (June 25, 2008), *available at* http://www.bop.gov/DataSource/execute/dsPolicyLoc (citing AMERICAN CORRECTIONAL ASSOCIATION, STANDARDS FOR ADULT CORRECTIONAL INSTITUTIONS

---

[2] The American Correctional Association (ACA) offers accreditation to correctional institutions that comply with its standards.  According to the Department of Justice (DOJ), "[T]he BOP utilizes ACA to obtain an external assessment of its ability to meet the basics of corrections."  The United States Department of Justice, *Strategic Plan 2000 - 2005*, Strategic Objective 5.3, Strategies to Achieve the Objective, *available at* http://www.usdoj.gov/archive/mps/strategic2000_2005/goal5.htm.  Further, DOJ noted, "BOP will continue to prepare all activated facilities for accreditation with the [ACA]." *Id.*

(3d ed. 1990)).

Though BOP regulations do not appear to *require* outdoor recreation for all inmates under all circumstances, our cases demonstrate that a deprivation of outdoor exercise may amount to an Eighth Amendment violation, even when an inmate is afforded some measure of indoor exercise. This is because, as the majority opinion in this case notes:

> There is substantial agreement among the cases in this area that some form of regular *outdoor exercise* is extremely important to the psychological and physical well being of inmates, and some courts have held a denial of *fresh air and exercise* to be cruel and unusual punishment under certain circumstances.

Maj. Op., at 17 (quoting *Fogle v. Pierson*, 435 F.3d 1252, 1260 (10th Cir. 2006) (quoting *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (Kennedy, J.) (collecting cases))); *see also Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) ("Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation.").

Our cases suggest that the general rule entitling prisoners to outdoor exercise may not be violated, absent a strong justification. In *Bailey*, for example, we acknowledged that "a convicted murderer who had murdered another inmate and represented a major security risk *was entitled to outdoor exercise.*" *Housley*, 41 F.3d at 599 (emphasis added) (citing *Bailey*, 828 F.2d at 653). We did not find an Eighth

Amendment violation in *Bailey*, but we observed that the inmate was permitted to exercise in an outdoor facility for one hour per week. *Bailey*, 828 F.2d at 653. In fact, we cabined our holding in *Bailey*, avoiding a suggestion that a more complete deprivation would be permissible: "*Although this amount of exposure to exercise and fresh air is still restrictive*, we cannot say, without more, that it fails to satisfy the demands of the Eighth Amendment." *Id.* (emphasis added).

In *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803, 809-10 (10th Cir. 1999), which the government did not address before this court, we held that a one-year deprivation of outdoor exercise *did* give rise to an Eighth Amendment claim. There, a prisoner was "permitted to leave his cell for thirty minutes each day, to take a shower . . . [and was not] permitted to exercise outside his cell for over a year." *Id.* at 810 (emphasis added). While the prisoner had been deprived of all out-of-cell exercise, we labeled Mr. Perkins's argument a "claim for deprivation of *outdoor* exercise." *Id.* (emphasis added). Relying on then-Judge Kennedy's discussion of fresh air and outdoor exercise in *Spain*, we found that Mr. Perkins's alleged deprivation of outdoor exercise was sufficient to state an Eighth Amendment claim. *Id.* (holding that the "district court erred when it held that plaintiff's allegations about the *extended deprivation of outdoor exercise* showed no excessive risk to his well-being") (internal quotation marks omitted) (emphasis added).

Similarly in *Fogle*, we held that a prisoner who had been placed in

administrative segregation after repeated escape attempts articulated an Eighth Amendment claim when he alleged he had been "denied all outdoor exercise for the three years he was in administrative segregation." 435 F.3d at 1259-60. In that case, the prisoner acknowledged that he was "allowed access to a cell with a pull-up bar a few times each week." *Id.* at 1260 n.4. However, consistent with *Perkins*, we observed that "the district court erred as a matter of law in concluding that a prisoner must allege denial of all exercise, not just outdoor exercise, to present an arguable claim" under the Eighth Amendment. *Id.* at 1260 (citing *Perkins*, 165 F.3d at 810).

While our cases recognize that prisoners are generally entitled to outdoor exercise, a denial of outdoor exercise is not an Eighth Amendment violation per se. *See Bailey*, 828 F.2d at 653. As we have recognized, "[t]he Eighth Amendment does not provide a fixed formula for determining whether the effect of particular conditions constitutes cruel and unusual punishment." *Id.* (internal quotation marks omitted). The length of a deprivation of outdoor exercise necessary to trigger an Eighth Amendment violation may vary, depending the government's justifications for the deprivation. *See Perkins*, 165 F.3d at 810 n.8 (observing that "what constitutes adequate exercise will depend on the circumstances of each case" including "penological considerations"); *cf. Yousef v. Reno*, 254 F.3d 1214, 1219 (10th Cir. 2001) (noting that prisoners convicted of terrorist activities may be subjected to Special Administrative Measures, "in 120 day increments," including administrative detention and limited contact with others).

Particularly in light of the principle that "what constitutes adequate exercise will depend on the circumstances of each case," *Perkins*, 165 F.3d at 810 n.8, the government has offered this court surprisingly little factual analysis in this case. The government has instead supplied us with the broad assertion that Mr. Ajaj "fail[ed] to state a[n Eighth Amendment] claim," Aple's Br. at 25, by alleging that he had been deprived of outdoor exercise for one year. The government cited two opinions, our decision in *Bailey* and one case from the Fifth Circuit, but neither provides any support for the government's contention. First, *Bailey* actually supports the position that an alleged one-year deprivation of all outdoor exercise could amount to an Eighth Amendment claim, as the *Bailey* court carefully observed that one hour of outdoor exercise per week was "restrictive," even if it was not in violation of the Eighth Amendment under those circumstances. 828 F.2d at 653. Similarly, in *Wilkerson v. Maggio*, 703 F.2d 909, 911-12 (5th Cir. 1983), the government's second case, the court held that prison officials were entitled to qualified immunity, notwithstanding the prisoner's contention that he had been denied outdoor recreation for approximately five years. However, the court reasoned that Mr. Wilkerson was permitted to exercise regularly in a room that was "about thirty yards long" and was "lined with windows which permitted fresh air to enter the cell block area." *Id.* at 912. Unlike Mr. Wilkerson, Mr. Ajaj alleged – although he ultimately did not support the claim with particularized factual assertions – that he was denied access

to fresh air and sunlight for one year.[3]

While I disagree with the government's apparent contention that Mr. Ajaj failed to allege an Eighth Amendment violation when he asserted that he was denied outdoor exercise for one year, I agree that the defendants are entitled to qualified immunity. As the majority correctly observes, the record generated before the district court – which the government did not address in depth before this court – demonstrates that Mr. Ajaj was offered, but refused, outdoor exercise on several occasions during his first year at ADX. The record also suggests, and Mr. Ajaj does not dispute, that prison officials afforded him regular solitary indoor exercise opportunities (as seems warranted by these facts). Therefore, I join the majority's opinion.

Nonetheless, as noted above our cases clearly suggest that failure to allow adequate exercise (in most cases with an outdoor component) for a period of a year raises real constitutional concern. As federal prisons aspire to the standards of the ACA and must follow Eighth Amendment jurisprudence, I am perplexed that the

---

[3] The government's opening brief also discussed *In re Long Term Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464 (4th Cir. 1999), which it characterized as "the most analogous published decision" addressing an Eighth Amendment conditions of confinement claim involving an inmate housed in administrative segregation. Aple's Br. at 24. Although the government did not cite this case for the proposition that a one-year deprivation of outdoor exercise could not violate the Eighth Amendment, I note that the *In re Long Term Segregation* court did not discuss outdoor recreation; it appears that the prisoners did not raise the issue. Rather, the court simply noted that approximately five hours of exercise per week did not violate the Eighth Amendment under the facts of that case. *See id.* at 471-72.

government did not explicitly discuss the facts that allowed it to prevail.